UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN LUCAS, ARONZO DAVIS, and NORMAN GREEN, on behalf of themselves and similarly situated laborers, | ) ) ) ) ) ) | No. 13 CV 1524 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| GOLD STANDARD BAKING, INC., PERSONNEL STAFFING GROUP, LLC d/b/a MVP, | ) ) ) ) | |
| Defendants. | ) ) | April 24, 2017 |

## MEMORANDUM OPINION and ORDER

Before the court is Defendant Personnel Staffing Group, LLC d/b/a Most Valuable Personnel's ("MVP") motion to compel the depositions of Aronzo Davis and Torrence Vaughans[1] and to adjudicate the attorney-client privilege assertion. For the following reasons, the motion is denied:

## Background

Plaintiffs allege in this case that Defendants denied them employment because of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. (R. 322, Fifth Am. Compl. ¶ 1.) MVP is a "temporary staffing agency" with an office in Cicero, Illinois, which "provides temporary labor personnel to third party clients," including

---

[1] Vaughans withdrew as a named Plaintiff in this case but remains "an absent member of a putative class." (R. 322, Fifth Am. Compl. at 1 n.1.)

Defendant Gold Standard Baking, Inc. ("GSB"). (R. 326, MVP's Answer ¶¶ 16, 49.) Plaintiffs accuse GSB and MVP of "engaging in a discriminatory practice of assigning almost exclusively Latino employees to work at [GSB]," to the detriment of African American workers. (R. 322, Fifth Am. Compl. ¶ 71.)

In its motion, MVP seeks to compel Davis and Vaughans to answer deposition questions regarding conversations they had with their counsel of record, Christopher Williams, when they each met Williams for the first time. (R. 382, MVP's Mot. at 1.) Davis and Vaughans first met Williams after a "Know Your Rights" ("KYR") seminar he presented. (R. 395, Pls.' Resp. at 1, Ex. A, Williams Decl. ¶ 14.) At these KYR seminars Williams generally discusses information about discrimination in the workplace, sexual harassment, use of background checks, minimum wage and overtime laws, and other work-related legal topics. (Id., Ex. A-1 at 1.) After KYR seminars, Williams conducts free, one-on-one legal clinics, which sometimes result in new client relationships. (Id., Ex. A, Williams Decl. ¶ 14.)

Vaughans attended one of Williams's KYR presentations in the fall of 2011. (Id., Ex. B, Vaughans Decl. ¶ 3.) Vaughans had not previously known Williams. (Id. ¶ 4.) Vaughans approached Williams after the seminar and spoke one-on-one with him "to get legal advice . . . about how some of the laws he talked about affected jobs where [Vaughans] had worked and jobs where [Vaughans] had applied." (Id.) At the time, Vaughans "had already been looking for work at MVP and several other temporary staffing agencies where [he] had worked." (Id. ¶ 5.) Williams told Vaughans that their conversation would be confidential. (Id. ¶ 6.)

Similarly, Davis met with Williams in the summer or fall of 2011 after a KYR presentation. (Id., Ex. C, Davis Decl. ¶ 3.) Davis had not known Williams before that day. (Id. ¶ 4.) Davis asked to meet with Williams to obtain legal advice regarding one of the topics addressed in the seminar. (Id. ¶¶ 3, 4.) Williams told Davis that the conversation would be confidential. (Id. ¶ 3.)

During their depositions, MVP asked Davis and Vaughans questions about their initial conversations with Williams. (R. 382, MVP's Mot. at 1.) In response to the questions about what Williams said to each individual and vice versa, Williams asserted the attorney-client privilege and directed Davis and Vaughans not to respond. (R. 384, MVP's Mem. at 1, 5, 7.) MVP argues that these conversations are not privileged.

**Analysis**

MVP argues that Davis and Vaughans should be compelled to answer the disputed deposition questions because, according to MVP, the responses are not protected by the attorney-client privilege. Federal law provides the rules of decision in this case, so issues of privilege are governed by federal common law. *See* Fed. R. Evid. 501; *Jaffee v. Redmond,* 518 U.S. 1, 5-6 (1996) (applying federal common law of privileges to a case including a claim under 42 U.S.C. § 1983); *In re Pebsworth,* 705 F.2d 261, 262 (7th Cir. 1983) (in non-diversity actions privileges are matters of federal common law). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby

3

promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The Seventh Circuit has articulated the following standard for determining whether the attorney-client privilege attaches:

> '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.'

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (1961)); *see also Jenkins v. Bartlett,* 487 F.3d 482, 490 (7th Cir. 2007). Because the privilege is "in derogation of the search for the truth," this court construes it narrowly. *Evans*, 113 F.3d at 1461. The party seeking privilege protection carries the burden of showing that it applies. *Valero Energy Corp. v. United States,* 569 F.3d 626, 630 (7th Cir. 2009).

MVP argues that Williams's initial meetings with Davis and Vaughans are not protected by the attorney-client privilege for two reasons: first, no attorney-client relationship existed at the time that Williams first met with Davis and Vaughans; and second, even if a privilege attached, Williams waived the privilege. (See R. 384, MVP's Mem. at 2, 6.) As an initial matter, the court must determine whether the attorney-client privilege attaches to the communications sought before addressing whether the privilege has been waived. Under federal common law, an attorney-client privilege may attach even if there is no "formal" or "express"

attorney-client relationship.[2] *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978). Indeed, "[t]he fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." *Id.* Determining whether the privilege attaches "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Id.* (citations omitted); *United States v. Jenkens & Gilchrist, P.C.*, No. 03 CV 5693, 2005 WL 1300768, at *2 (N.D. Ill. March 10, 2005).

Here, the evidence shows that Vaughans intended to seek legal advice from Williams in his capacity as an attorney and in confidence during their first meeting. *See Evans*, 113 F.3d at 1461; *Westinghouse*, 580 F.2d at 1319. Vaughans declares that "[t]he only reason [he initially] met with Mr. Williams . . . was to get legal advice from him about how some of the laws he talked about" affected him. (R. 395, Pls.' Resp., Ex. B, Vaughans Decl. ¶ 4.) Furthermore, Vaughans and Williams intended for their conversation to be confidential. (Id. ¶ 6.) It matters not that Vaughans had not signed a retainer agreement or paid fees to Williams. *See Westinghouse*, 580 F.2d at 1319. It is sufficient that Vaughans believed he was consulting Williams for professional legal advice and that Williams assented. *Id.*; *Evans*, 113 F.3d at 1461.

---

[2] MVP cites Illinois law stating that an attorney-client relationship may be created in Illinois only "by a retainer or an offer to retain or a fee paid" and by mutual consent. (R. 384, MVP's Mem. at 4 (quoting *People v. Simms*, 192 Ill. 2d 348, 382 (2000) (citation omitted).) However, federal common law governs privilege issues in this matter. *See* Fed. R. Evid. 501; *Jaffee*, 518 U.S. at 5-6.

MVP counters that Vaughans's deposition testimony contradicts his declaration. (R. 400, MVP's Reply at 1-2.) In particular, MVP cites Vaughans's testimony that he did not believe he had retained Williams as his attorney on the first—or even second—day that Vaughans met and spoke with Williams. (R. 384, MVP's Mem. at 4-5, Ex. A, Vaughans Dep., Aug. 18, 2014, at 45:3-50:12.) Other portions of Vaughans's transcript show, however, that he was confused about what was required to establish an attorney-client relationship. (Id., Ex. A, Vaughans Dep. 50:18-20.) For example, when asked during the deposition whether Williams was his attorney, Vaughans responded, "I guess, if he's sitting right here. I don't know. I guess." (Id.) When questioned later by Williams, Vaughans confirmed that Williams is his attorney. (Id. at 163:23-165:2.) Regardless, as explained above, the privilege inquiry does not center on when Vaughans formally retained Williams as his counsel. *See Westinghouse*, 580 F.2d at 1319. Vaughans's declaration shows that during his first meeting with Williams, Vaughans believed he was consulting a lawyer and intended to seek legal advice. *Id.* Therefore, the attorney-client privilege attaches to their initial conversation. *Evans*, 113 F.3d at 1461.

Similarly, Davis's initial conversation with Williams is protected by the attorney-client privilege. Like Vaughans, Davis states that he first met with Williams to obtain "legal advice on one of the topics Mr. Williams had addressed during his presentation." (R. 395, Pls.' Resp., Ex. C, Davis Decl. ¶ 3.) Williams told Davis that the conversation would be confidential. (Id.) Furthermore, Davis testified in his deposition that "[a]fter [Williams's] seminar, [Davis] met with

6

Mr. Williams . . . [and] talked one-on-one." (R. 384, MVP's Mem. at 7, Ex. B, Davis Dep. at 12:14-13:18.) At that time, "[Williams] became [Davis's] lawyer," according to Davis. (Id.) Davis's testimony establishes that he sought legal advice from an attorney and that his confidential conversation with Williams related to that purpose. *See Evans*, 113 F.3d at 1461. Accordingly, the attorney-client privilege attaches to Davis's initial conversation with Williams.

The court next addresses whether Williams's radio interview amounts to a waiver of the attorney-client privilege. Under federal common law, the attorney-client privilege may be waived through public disclosure of protected communications. *See Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 711 (N.D. Ill. 2015). "Disclosure of confidential communications is inconsistent with the attorney-client relationship and almost invariably waives the privilege." *Id.* (citing *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003)). MVP argues that Williams waived the privilege when he made the following statements to host Perri Small during a December 2016 interview on WVON 1690 AM radio:

> *Perri Small*: So when did this stuff hit the fan? When did this come to your attention, and how did you get involved?
>
> *Christopher Williams*: Well, I actually think that I should've figured this out much earlier when I was doing these cases when I saw the lists of names working at the staffing agencies, and saw mostly Hispanic names. We had a couple of guys referred to us, African-American men referred to us from community organizations. I sat down with them, they had generalized complaints about discrimination. We conducted a pre-suit investigation where I sat down with them and we met periodically and noted down what their experience was.

7

(R. 384, MVP's Mem. at 2-3 (quoting *Perri Small Show* (WVON 1690 AM radio broadcast Dec. 20, 2016)).) Specifically, MVP argues that Williams, by having divulged information about his initial discussions with Davis and Vaughans, cannot now use the privilege to shield information relating to those discussions. (Id. at 9.) The court disagrees.

To effect a waiver, a party must have publicly disclosed *privileged* attorney-client communications. *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, No. 03 CV 2934, 2007 WL 781252, at *3 (N.D. Ill. March 8, 2007) ("[M]erely adverting to the nature of a communication . . . cannot be held to amount to a revelation of the protected information that waives the attorney-client privilege."); *see also Patrick*, 154 F. Supp. 3d at 711; *In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel*, 666 F. Supp. 1148, 1153 (N.D. Ill. 1987). "There is a significant difference between indicating the fact or topic of a confidential [communication] with an attorney and revealing its content. The latter effects a waiver of the attorney-client privilege, while the former does not." *Murata Mfg.*, 2007 WL 781252 at *3. Here, Williams spoke publicly of "generalized complaints about discrimination." (R. 384, MVP's Mem. at 2, 9.) Williams did not disclose the confidential, one-on-one conversations that he had with Davis or Vaughans during their initial meetings. (Id.) Therefore, Williams did not waive the attorney-client privilege attaching to these conversations during his radio interview in December 2016.

## Conclusion

For the foregoing reasons, MVP's motion to compel is denied.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**