# EXHIBIT A

## DECLARATION OF ROSA CEJA

I, Rosa Ceja, under penalty of perjury, state based on personal knowledge that the following facts are true and correct:

1. I am over the age of 21 years.

2. I currently reside in Waukegan, Illinois.

3. I have been employed with Personnel Staffing Group, LLC d/b/a MVP ("MVP") since on or about March 1, 2014.

4. From approximately March 1, 2014 to June 22, 2014, I was employed by MVP as an onsite manager at one of MVP's client companies located in Waukegan, Illinois ("Waukegan Client"), which was primarily served by MVP's Waukegan office located at 226 Sheridan Road in Waukegan, Illinois ("Waukegan Office").

5. From approximately June 23, 2014 to approximately August 26, 2014, I was transferred by MVP to work at its Elmwood Park Office located at 7514 W. North Avenue in Elmwood Park, Illinois ("Elmwood Park Office") as a dispatcher. The manager of the Elmwood Park Office is a man named Billy Platt.

6. For approximately two or three weeks after August 26, 2014, I worked as an assistant onsite manager assisting onsite manager Maciel Ramos at one of MVP's client companies in Niles, Illinois ("Niles Client"), which was primarily served by MVP's Elmwood Park Office. During this period, Mr. Ramos was the onsite manager for multiple client companies of MVP.

7. In about mid-September of 2014, I became the onsite manager at the Niles Client.

8. On or about early October 13, 2014, I was reassigned by Billy Platt to be a dispatcher at the Elmwood Park Office and scheduled to work a shift from 4:00 p.m. to midnight each day. On October 14, 2014, I emailed Mr. Platt to let him know that I could not work that late

shift at the Elmwood Park Office because I did not feel safe closing the office by myself at that late hour. I have not been offered another assignment by MVP to this date.

9. As a dispatcher at the Elmwood Park Office, my job was to take applications from laborers seeking work assignments, to fill orders for laborers given to me each day either by MVP's onsite managers at the various client companies or directly by a client company, and to submit the hours worked by laborers, as reported to me by onsite managers or clients, to MVP's payroll office.

10. Typically, laborers who came to MVP's Elmwood Park Office seeking a work assignment would fill out an application with their contact information on the first day they came to the dispatch office, even if not assigned to work, and would sign in on a sign-in sheet in the dispatch office each day. While I was employed as a dispatcher at MVP's Elmwood Park Office, MVP's policy was to retain a copy of both laborers applications and the daily sign-in sheets. The practice was to place the active applications on the top shelf sorted alphabetically in the dispatcher area and the inactive applications on the bottom shelf. At the Elmwood Park Office, an application became inactive after three attempts to call and assign a laborer without a response.

11. While employed at MVP, I regularly talked to other dispatchers in MVP's Cicero office located at 5637 W. Roosevelt in Cicero, Illinois ("Cicero office") and Waukegan Office. I also regularly visited each of those offices to see other dispatchers who are my friends and for business reasons. For example, MVP asked me to deliver checks to laborers assigned out of the Cicero Office. So on multiple occasions I spent several hours on weekend days at the Cicero Office while laborers came to pick up their checks. While I was there, I had the opportunity to talk to the dispatchers there at length about the Cicero Office's practices and policies. As a result, I know that these offices followed the same practices for taking applications, using sign-in sheets and preserving active and inactive applications as described in paragraph 10, except that applications became inactive at the Waukegan and Cicero Offices after three (3) months of no assignment.

2

12. While employed as a dispatcher at the Elmwood Park Office, I know that MVP dispatchers, including myself, would fill client company orders for laborers using the following methods: assigning laborers who walked into the dispatch office seeking a work assignment; calling laborers who had previously left their contact information; taking phone calls from laborers with active applications who were seeking assignments; and assigning laborers who had been recruited and were transported to the MVP Elmwood Park Office by MVP's team of van drivers.

13. While I was employed as a dispatcher, the Elmwood Park Office typically assigned about fifty (50) laborers on each of the three daily shifts, or about one hundred and fifty (150) laborers in total each day, although the number would vary somewhat.

14. I know from conversations with dispatchers at MVP's Cicero Office, that the practices of assigning laborers at the Elmwood Park Office described in paragraphs 10 – 12 above was the same protocol followed by the Cicero Office in recruiting and assigning laborers, although I was told by Cicero Office dispatchers that they typically assigned a lot more laborers than Elmwood Park to MVP's client companies each day.

15. To the best of my knowledge, the MVP Cicero Office has a total of eight (8) dispatchers and the Elmwood Park Office has five (5) dispatchers. All of the dispatchers work under the close supervision and direction of the office managers and Darron Grotollo, Director of Operations for MVP, and company owners Daniel Barnett and David Barnett.

16. To the best of my knowledge, MVP employed approximately ten (10) van drivers in total. Through conversations with MVP's van drivers and other dispatchers, I know that the van drivers generally recruit laborers from the Little Village area of Chicago, particularly in the area of 26th Street and St. Louis Street. I know that all of the laborers recruited and transported by the MVP van drivers to the Elmwood Park Office while I was working at that office were Latinos. I also know, through conversations with van drivers and other dispatchers at MVP's Elmwood Park

3

Office and MVP's Cicero Office, that van drivers recruited and transported only Latino laborer's to MVP's dispatch offices.

17. I know that certain clients of MVP do not want African American's assigned to work at their company and that MVP has a policy and practice of accommodating these requests. In fact, I have personally been yelled at by representatives of client companies, including the Waukegan Client, about African Americans I assigned, and I have been warned by David Barnett and office managers not to send African-Americans because MVP could lose the account if I did.

18. I know through my experiences and conversations with other dispatchers, office managers and other MVP management that MVP has a policy and practice of preferring Latino laborers, without consideration of individual factors such as special skills or abilities.

19. I believe that many of MVP's clients preferred immigrant workers because they are less likely to complain about things like being injured on the job or being underpaid. MVP had a rule in all of its branch offices in Illinois that dispatchers and onsite managers could not refer to a laborer's race when communicating about orders for laborers but instead should use code words. For example, dispatchers, including myself, were told to use the term "feos" (translated as "ugly ones") to refer to Latinos and "guapos" (translated as "handsome ones") to refer to African Americans, or to use "bilingues" or "bilinguals" to refer to Latinos and "no bilingues" or "not bilinguals" to refer to African-Americans. I know this because I was told this directly by office managers and because I regularly talked to dispatchers in other offices and learned that they were told the same thing.

20. The Waukegan Office Manager, for example, told me directly that these had been the rules for MVP "forever" and that if Darron Grotollo ever found us using the terms "black", "African-American", "Hispanic" or "Latino" instead of these code words to describe a laborer's race, we would be fired.

4

21. I know from conversations with other dispatchers, including at MVP's Cicero Office, that they were similarly warned to follow the same policy and practice when a client does not want African-Americans assigned at its company. I know from conversations with dispatchers at MVP's Cicero Office that Gold Standard Baking, Inc. ("GSB") did not want African-Americans assigned to work there.

22. In a conversation with dispatchers from MVP's Cicero Office, I learned that MVP employees also used the expression "los que escuchan a La Ley" or "a La Que Buena" (translated as "those who listen to La Ley" or to "La Que Buena", the names of Spanish-language radio stations in the Chicagoland area) to refer to Latinos.

23. When MVP's Cicero Office did not have enough laborers to fill orders for its client companies, those dispatchers would call MVP's Elmwood Park Office to request that we provide extra laborers to them from the Elmwood Park Office and vice versa. This exchange of laborers between offices happened almost every day. On several occasions, I took calls from MVP's Cicero Office making such a request myself.

24. When dispatchers at the Cicero Office requested extra laborers from the Elmwood Park Office to complete orders at GSB, we were told GSB only wanted Latinos.

25. In fact, one time when I was at the Elmwood Park Office, Darron Grotollo called and asked me if we had any laborers available to work at GSB "que escuchan a La Ley" (translated as "who listen to [Spanish-language radio station] La Ley", which I understood to mean Latinos.

26. To be able to work at GSB, laborers only needed to participate in an orientation and watch a video which was provided after MVP made the assignment. No special prior training or skills were required for a laborer to be assigned to GSB.

27. I am not suffering any impediments and am competent to testify to all of the foregoing.

5

I declared under penalty of perjury that the foregoing is true and correct.

Executed Dated: November 20, 2014

_____
Rosa Ceja