# EXHIBIT C

1       Q.   So the difference between whether
2  somebody is a daily and somebody who is a temp
3  to hire may be about their performance on the
4  job once they get there?
5       A.   Correct.
6       Q.   Are you familiar with the term MVP 360?
7       A.   Yes.
8       Q.   What do you understand it to mean?
9       A.   They are a division of MVP who focuses
10 on more skilled positions, positions that
11 entail a little bit more requirements to fill.
12 Typically they are not minimum wage jobs.
13      Q.   Are any of the jobs that are listed on
14 Exhibit 2 in answer to interrogatory number 13
15 jobs that are filled through the, as part of
16 the MVP 360?
17      A.   No.
18      Q.   Okay.  When you screen candidates to be
19 referred to GSB, are there any requirements
20 that you look for before you are prepared to
21 refer them to GSB?
22           MR. RICHARDSON:  Objection to
23 form of the question.
24      A.   Yes.

1   Q. What are those?
2   A. We definitely look for basically what
3   the GMP is requiring, if someone has tattoos,
4   if someone has a lot of piercings, if someone
5   looks like they are not ready to work, if they
6   look gang related or things like that, we are
7   not going to send them to any client, for that
8   matter.
9   Q. If someone came in with tattoos that
10  were visible, what would you do with that
11  person?
12  A. We would let them know that there's a
13  position that opened up, but their tattoos need
14  to be covered up. It is up to them if they
15  decided to cover them up or not.
16  Q. The fact that they had tattoos would
17  not make them ineligible to be referred as long
18  as they covered up their tattoos?
19  A. Correct.
20  Q. If somebody came in with piercings --
21  A. They would need to take them out.
22  Q. Would that include earrings?
23  A. Yes.
24  Q. Okay.

1     A.   Or fake nails as well.
2     Q.   Okay.  What would they have to do with
3  fake nails?
4     A.   They would need to take them off.
5     Q.   They would have to take the fake nails
6  off?
7     A.   Correct, and polish.
8     Q.   Remove the nail polish?
9     A.   Yes.
10    Q.   You would tell them that when they
11 showed up to ask for work?
12    A.   Right, depending on what client.  There
13 were specific requirements because they were
14 dealing with food product or, you know,
15 whatever product they were dealing with, and it
16 was up to them if they wanted to remove
17 piercings, cover up tattoos, remove polish.
18    Q.   So, again, as I understood it, when
19 people walked in they wouldn't necessarily know
20 whether they might ultimately be referred for
21 employment?
22    A.   Correct.
23    Q.   So you would be advising candidates
24 about these changes, such as covering tattoos

1    and the like, only if you were referring them
2    to a client that required they not have those?
3         A.   Correct.
4         Q.   Like GSB?
5         A.   Correct.
6         Q.   Are there any, were there any other
7    things you did to screen candidates for
8    employment before you refer them to GSB?
9         A.   If some brought in resumes with their
10   experience, that would help.  But other than
11   that, no.
12        Q.   Did you check to see whether they were
13   lawfully eligible to work in this country?
14        A.   Like their documents?
15        Q.   Well, you tell me.  What are documents?
16   What are you referring to?
17        A.   They would provide Social Security,
18   their Social Security card, their driver's
19   state ID.  We would put them through our
20   system, which is a vendor that basically checks
21   or gives us a red light if there's -- a red
22   flag if there's anything wrong with any of
23   their documents.
24        Q.   So let me, I'm trying to understand

 1   what the documents are.
 2        A.  Social Security.
 3        Q.  They have to provide Social Security
 4   number?
 5        A.  Social Security, driver's license,
 6   passport.
 7        Q.  Would they have to provide a passport?
 8        A.  If they, if they had a passport I think
 9   that was like, there were sections of it, like
10   on our I-9 forms.  So I think if -- take that
11   back.
12                 With the passport, if they
13   provided a passport I believe that's all they
14   would need for that certain section.  But if --
15   majority of the time it was their state ID, and
16   their Social Security card.
17        Q.  So they had several different methods
18   for meeting that requirement?
19        A.  Correct.
20        Q.  Apart from that, were there any other
21   things that you did to screen candidates for
22   referral to GSB?
23        A.  No.
24        Q.  Did you conduct a background

1  investigation?
2  A. Not unless -- not for Gold Standard.
3  Q. I'm only talking about GSB.
4  A. No, not for Gold Standard.
5  Q. Did you conduct any kind of credit
6  check for people before you referred them to
7  GSB?
8  A. No.
9  Q. Did you conduct any kind of criminal
10 background investigation before you referred
11 them to GSB?
12 A. No.
13 Q. You said that you would, if candidates
14 came in who looked like they were gang related,
15 you would not refer them. What would you be
16 looking for to see if somebody looked like they
17 were gang related?
18 A. Their behavior, first and foremost.
19 Their appearance as far as they are walking
20 into our lobby with their pants hanging below
21 their, you know, hanging --
22 Q. Right.
23 A. How they spoke to us. How we -- when
24 we would let them know certain assignment, how

1   they reacted, if, you know, they seemed like
2   they would want to go to work there or, you
3   know, just by talking to them.
4        Q.   Okay.  How long would these
5   conversations last?
6        A.   Two to three minutes.
7        Q.   Who made these judgments?
8        A.   Dispatchers.
9        Q.   Were they, dispatchers, provided
10  training on what to look for in candidates as
11  to whether to screen them out?
12       A.   Just behavior, like I said, their
13  appearances and how they react when we shared
14  certain information regarding where they are
15  going.  Do they really want to go, you know,
16  things like that.
17       Q.   Were the dispatchers trained in some
18  way about what to look for?
19       A.   There was no formal training, no.
20       Q.   Were you -- you said you are the one
21  who was immediate supervisor of dispatchers?
22       A.   Correct.
23       Q.   Did you do, take any steps to check to
24  see if they were applying factors or criteria

1    in making these judgments that you agreed with?

2              MR. RICHARDSON:  Object to form.

3         A.   Can you repeat that again?

4         Q.   Yes.  Did you take any steps as
5    supervisor of the dispatchers to see if they
6    were applying criteria in screening candidates
7    for referral to GSB that you would have agreed
8    with?

9              MR. RICHARDSON:  Same objection.

10        A.   I just feel like I'm not understanding.

11        Q.   Let me break it down a little bit.  So
12   you described the kind of things --

13        A.   We would look for.

14        Q.   -- dispatchers would look for in
15   deciding whether to not refer people to GSB,
16   would screen them out?

17        A.   Correct.

18        Q.   Did you ever take any steps to check to
19   see whether dispatchers were using criteria in
20   screening out people that you approved of?

21             MR. RICHARDSON:  Same objection.

22        A.   Yes.  I mean, they looked for the same
23   things that we had discussed, and obviously
24   look for things that the bakery preferred not

1   to have.

2       Q.  So when you say they looked for things
3   that we discussed, who is the "we" in that?

4       A.  Myself and the dispatchers.

5       Q.  So you met with the dispatchers to talk
6   to them about what kind of things to look for
7   to screen out candidates?

8       A.  Correct, which is what I stated:
9   behavior, appearance, reactions to sending them
10  off to an assignment after explaining to them
11  exactly what they were going to be doing.

12      Q.  Okay.  You said there also was some way
13  in which this was communicated by Gold
14  Standard?

15      A.  Correct.  Some of these things are in
16  their GMPs:  No tattoos, the pants not sagging,
17  things like that.

18      Q.  Looking for something that might signal
19  your term gang related, was that something that
20  was in the GMPs?

21      A.  It wasn't exactly stated, but we just,
22  there was -- they wanted no one to be gang --
23  there was no visible, whether it was a tattoo
24  or anything to show any visibility of gang

1　affiliated.

2　　　Q.　How would you know what to look for to
3　signify somebody is gang related?

4　　　A.　Dispatchers knew, just because of where
5　they lived or, you know, things like that.  Or
6　the frequency of working in the office and
7　seeing people coming in.  It wasn't something
8　that was written down.  It was just by common
9　street knowledge, if you will.

10　　　Q.　Is that something that you felt you
11　were familiar with as to what would signify
12　somebody was gang related?

13　　　A.　I mean, I'm also knowledgeable, too.  I
14　have an idea of what someone looks like when
15　they are gang related or, you know, how they
16　act, how they present themselves.

17　　　Q.　Okay.  Was the criteria that somebody
18　not look like they were gang related be
19　something that was communicated by GSB that it
20　did not want referred to them?

21　　　A.　They just said make sure tattoos are
22　covered up and try to weed out any people that
23　you -- that may be gang related, gang
24　affiliated.

1        Q.   That was something that they cautioned
2   you about, not referring people with that --
3        A.   Right.
4        Q.   Okay.  So who was the one who did the
5   checking on people's Social Security and other
6   information, check to make sure it was valid?
7        A.   Every dispatcher, whoever entered the
8   application.
9        Q.   But, I'm sorry, where did they enter
10  that information into?
11       A.   A third party vendor.
12       Q.   What was the name of the vendor?
13       A.   Lookout Services.
14       Q.   It would come back either green or red?
15       A.   Right.  If there was something wrong
16  with it, or didn't seem valid, they would let
17  us -- they would not let us proceed.
18       Q.   At that point what would you do with
19  somebody like that?
20       A.   We would let them know that we can't
21  accept that form of identification, let them
22  know we can't enter their application.
23       Q.   Okay.  At what point if -- so you at
24  some point created a database I gather of