# **EXHIBIT E**

# DECLARATION OF DAISY CORRAL

I, Daisy Corral, under penalty of perjury, state based on personal knowledge and information that the following facts are true and correct:

1. I am over the age of 21 years and currently reside in East Chicago, Indiana.

2. I was employed with Personnel Staffing Group, LLC d/b/a MVP ("MVP") from approximately July 21, 2014 through approximately January 4, 2016. During my employment with MVP, I had the job title of Onsite Supervisor ("Onsite") and was assigned to work onsite at one of MVP's client companies, Gold Standard Baking, Inc. ("GSB") located at 3700 S. Kedzie in Chicago, Illinois. I was scheduled to work the day shift on weekends.

3. In or about October or November of 2015, I and other Onsites were informed that MVP had been sold to another staffing agency called Elite Staffing ("Elite"). Elite assumed MVP's service contract with GSB and, as far as I am aware, hired all of MVP's Onsite staff, temporary laborers and took over all of MVP's equipment, such as computers. Effective in January 2016, Janet Rostro became the Onsite Manager at GSB for Elite. I continued to be employed as an Onsite at GSB from approximately January 5, 2016 to June 15, 2016 for Elite.

4. After Elite took over for MVP at GSB in January 2016, I continued performing the same duties as with MVP. We were also given additional duties relating to completing paperwork, but the work I performed as an Onsite was substantially the same. As far as I was aware, nothing changed about the job duties of the Onsite Manager and other Onsites.

5. When I became employed by Elite, Elite promised to credit my years of service with MVP toward years of service with Elite.

6. In my role as an Onsite at GSB, my duties included: taking work orders for temporary laborers from GSB supervisors and line leaders; working with MVP's Dispatch Office (and later Elite's Dispatch Office) to fill these orders; recruiting laborers from a list of laborers maintained at GSB who

1

had completed the GSB Orientation at MVP's Dispatch Office (and later Elite's Dispatch Office); taking newly assigned workers on a tour of GSB to provide them with information GSB wanted to relay about good manufacturing practices ("GMPs") and other GSB rules; enrolling new employees in the biometric time keeping system at GSB; assisting in reviewing and correcting records of time worked by temporary laborers in the system for MVP's Payroll Department (and later Elite's Payroll Department"); making sure MVP's (and later Elite's) temporary laborers were complying with GSB's GMPs while on the company floor; relaying complaints from GSB supervisors to laborers; taking accident and incident reports and forwarding those reports to my supervisors; and assisting in investigating complaints from temporary laborers about missing pay, referring the results of such investigation to my supervisors and/or the Payroll Department.

7. MVP, and later Elite, typically assigned about 200 temporary laborers to GSB each day.

8. The GSB Plant Manager and supervisors for each department of GSB had the final say about which laborers to assign to each department and which laborers to put on a "Do Not Return" ("DNR") list, which meant that the laborer was no longer eligible to be assigned to GSB. If a department supervisor told an Onsite not to assign a laborer to that department or to DNR a laborer, we were required to follow the GSB supervisor's direction. Additionally, if a department supervisor wanted a particular laborer or group of laborers to be assigned to his department, we do the best we could to comply with those requests.

9. MVP (and later Elite) could also DNR a laborer for violating company rules, but Onsites could only recommend such action be taken to the Onsite Manager, Janet Rostro made the final determination of whether to DNR a laborer.

10. During the course of my employment, up to approximately August of 2015, MVP did occasionally assign African American laborers to work at GSB. Typically, African American laborers were given daily assignments (known as "ASAPs") and did not have equal access to the opportunity to

2

be put on a regular schedule at GSB. In general, the laborers put on the regular schedule at GSB were Hispanic. Instead, African American laborers who were assigned to work at GSB as ASAPs were often assigned to the weekend shift to avoid overtime for Hispanic laborers on the regular schedule during the week.

11. While I was employed as an Onsite, several GSB supervisors would tell me not to assign African American laborers to their departments and would complain if I did assign African American laborers to those departments.

12. During the course of my employment, up to approximately August of 2015, when African American laborers were assigned to GSB, they were typically placed in the worst jobs. For example, African American laborers are disproportionately assigned to work in Danish Production or the oven room, where laborers are required to work in excessive and constant heat. In fact, several of the laborers assigned to this position have collapsed while working in the heat.

13. At one point, I sent an email to my supervisor, Janet Rostro, suggesting that we rotate workers assigned to Danish Production, or the oven room, positions African Americans were disproportionately assigned to fill, into the cooler production area. Nothing happened as a result of my suggestion.

14. In or about late August 2015 or early September 2015, my supervisor Janet Rostro called a mandatory meeting at GSB for all MVP Onsites at GSB. The meeting was held during the week, on one of my days off.

15. At the meeting, Janet Rostro informed us that GSB had instructed her to stop assigning African American laborers to GSB. Ms. Rostro told us to start taking African Americans currently assigned to GSB off of the schedule and to inform any African Americans contacting any Onsites for work that the there was a hiring freeze at GSB, which was not true. Many of the Onsites at the meeting, including myself, complained about the policy and told Ms. Rostro that this practice would be illegal.

3

Ms. Rostro responded that this is what the customer wants, so it is on them, not us, or words to that effect.

16. From the date of the above-described meeting, the number of African American laborers assigned to work at MVP (and later Elite) to fill positions at GSB steadily decreased. By late Fall of 2015, continuing into the Winter of 2015 up through approximately March of 2016, very few African Americans were assigned to work at GSB as Janet Rostro had informed us GSB had requested. African Americans who were assigned during this period worked fewer total hours. During this period, the laborers assigned to GSB by MVP (and later Elite) were overwhelmingly Hispanic.

17. MVP (and later Elite) maintains a report called "Employee Hours by Labor Account (Excel)" which shows the names of each laborer assigned to GSB during a work week and the number of hours worked by each worker during each work week. These reports for the period of before the date of the above-described meeting and after the meeting through March 2016 show that the number of non-Hispanics assigned to work at GSB went down dramatically after the meeting and, further, that the number of hours worked by non-Hispanics decreased even more.

18. In order to work at GSB, a laborer must complete a GSB-specific orientation at MVP's (and later Elite's) Dispatch Office. Prior to the above-described meeting with Janet Rostro, we would inform African American laborers who inquired about work at GSB that they would have to complete an orientation in order to work at GSB. At the above-described meeting with Janet Rostro, Ms. Rostro informed us not to advise African American laborers about GSB orientations and, if asked, to say MVP (and later Elite) was not conducting GSB orientations, which was not true.

19. The Dispatch Office of MVP (and later Elite) would email or send to the GSB Onsites a list of laborers who had completed the GSB orientation and were eligible to be assigned to GSB. These lists for the period of before the date of the above-described meeting and after the meeting through March 2016 will show that number of non-Hispanic laborers who completed the GSB orientation went

4

down dramatically after the meeting.

20. During the period of the above-described meeting and March 2016, I and other Onsites received over a hundred calls from African American laborers seeking work at GSB, but we told them that there was a hiring freeze as instructed and these laborers were not given an opportunity to be assigned at GSB.

21. The practice of not assigning African American laborers to GSB continued until approximately March 2016. In or about March of 2016, Janet Rostro told us to start bringing back African American laborers. This practice did stop at this point.

22. A little while later, all of Elite's staff were called to one of two full-day mandatory meetings held during the week at which Elite's upper management and attorneys were present to give a presentation on discrimination laws. Other topics were discussed as well.

23. However, despite the fact that this practice stopped, there continue to be fewer assignments available to African American laborers, for shorter duration and in worse jobs up through the end of my employment.

24. GSB also often makes requests for men only to fill certain positions. MVP (and later Elite) accommodates these requests. When making a request to fill an assignment, GSB supervisors use code words in emails such as "lights" for women and "heavies" for men or "Packer A" for women and "Packer B" for men. When Onsites and Dispatchers at MVP's (and now Elite's) Dispatch Offices, the same code words are used in emails and other communications regarding the filling of such requests.

25. When I began working as an Onsite at GSB, Alejandro Salgado was the plant manager for GSB and stayed in that role until late fall of 2015, after the implementation of the policy to not assign African Americans to GSB.

26. I understand that in or about June or July of 2016, Alejandro Salgado was re-hired as the Plant Manager at GSB.

5

I declared under penalty of perjury that the foregoing is true and correct.

*[signature]*
Daisy Corral

Dated: August 31, 2016