# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAMES ZOLLICOFFER, ANTWOIN HUNT, and NORMAN GREEN, on behalf of themselves and similarly situated laborers, | |
| Plaintiffs, | Case No. 13 C 1524 |
| v. | Judge Ellis |
| GOLD STANDARD BAKING, INC., PERSONNEL STAFFING GROUP, LLC d/b/a MOST VALUABLE PERSONNEL d/b/a MVP, | Magistrate Judge Kim |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION TO STRIKE THE DECLARATION OF MARC BENDICK, Ph.D.</u>

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ............................................................................................... 3

    A. Dr. Bendick's Delayed Production and the Need to Correct His Initial Declaration.................................................................................................. 3

    B. Dr. Bendick Did Not Adequately Supervise Work Performed By Others That Was Critical to his Conclusions................................................... 5

    C. Dr. Bendick's Declaration ......................................................................... 7

    D. Dr. Amidon ................................................................................................. 9

III. ARGUMENT ................................................................................................... 9

    A. Dr. Bendick's Estimate of Expected Representation is Not Reliable.................. 12

        1. Dr. Bendick Failed to Verify The Primary Source Data Behind His "Reasonable Recruitment Area" and, Therefore, His Expected Availability Estimate, and That Data Set Was Incomplete..................... 12

        2. Non-Expert Warren Glimpse's Non-Hispanic African-American PUMA Calculations Cannot Be Replicated ............................................ 15

        3. Bendick's Analysis Ignores Many Relevant PUMAs............................. 16

        4. Dr. Bendick's Failure to Report Margins of Error Invalidates His Entire Analysis................................................................................... 17

    B. Dr. Bendick's Estimates of the Actual Representation of Non-Hispanic African Americans Among GSB Referrals Are Incorrectly Calculated and Unreliable............................................................................ 19

        1. Dr. Bendick Failed to Assign Addresses to (and Therefore Estimated Race for) Many GSB Referrals and Underestimated the Percentage of Non-Hispanic African-Americans Referred to GSB. ....... 20

        2. Dr. Bendick Failed to Investigate the Reasons for Referred Employees' Missing Addresses, But Still Included Their Hours in His Estimates. .......................................................................... 23

        3. Dr. Bendick Failed to Investigate the Reasons for Referred Employees' Suspect Hours, But Still Included Them in His Estimates. ...................................................................................... 23

        4. Dr. Bendick Used Different Data to Calculate the Actual Representation of GSB Approvals Than He Used to Calculate Estimated Representation.................................................................. 24

    C. Dr. Bendick's Dependent Conclusions Are All Unreliable. ............................. 25

IV. CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bowman for J.B. v. Int'l Bus. Machines Corp.*,
  No. 1:11-CV-0593 RLY-TAB, 2013 WL 12290833 (S.D. Ind. Aug. 16, 2013)....................16

*Cano v. Cont'l Airlines Inc.*,
  193 F. App'x 664 (9th Cir. 2006) ..........................................................................................11

*Comcast v. Behrend*,
  569 U.S. 27 (2013).................................................................................................................10

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995).....................................10, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................................9, 10, 11

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) ................................................................................................15

*EEOC v. Sears, Roebuck & Co.*,
  628 F. Supp. 1264 (N.D. Ill. 1986) ......................................................................................13

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ................................................................................................10

*Forte v. Liquidnet Holdings, Inc.*,
  675 F. App'x 21 (2d Cir. 2017) ........................................................................................14, 15

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...........................................................................................................9, 10

*Harris v. Clark*,
  No. 06-C-529, 2009 U.S. Dist. LEXIS 63643 (E.D. Wis. June 16, 2009) ............................16

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)....................................................................................................10

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ................................................................................................11

*Krik v. Exxon Mobil Corp.*,
  870 F.3d 669 (7th Cir. 2017) ................................................................................................11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).......................................................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Messner v. Northshore Univ. Healthsystem,*
    669 F.3d 802 (7th Cir. 2012) ............................................................................10

*Munoz v. Orr,*
    200 F.3d 291 (5th Cir. 2000) ............................................................................13

*Paz v. Brush Eng'd. Mat'ls., Inc.,*
    555 F.3d 383 (5th Cir. 2009) ............................................................................11

*Seaman v. Seacor Marine L.L.C.,*
    326 F. App'x 721 (5th Cir. 2009) ......................................................................11

*Sullivan v. Worley Catastrophe Servs., LLC,*
    No. 11-2597, 2013 WL 5530277 (E.D. La. Oct. 7, 2013), *aff'd,* 591 F. App'x
    243 (5th Cir. 2014)............................................................................................11

*Tanner v. Westbrook,*
    174 F.3d 542 (5th Cir. 1999) ......................................................................11, 19

*Tyus v. Urban Search Mgmt.,*
    102 F.3d 256 (7th Cir. 1996) ............................................................................10

*Weisgram v. Marley Co.,*
    528 U.S. 440 (2000)...........................................................................................10

*Zenith Electronics Corp. v. WH-TV Broad. Corp.,*
    395 F.3d 416 (7th Cir. 2005) ......................................................................15, 16

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(ii)....................................................................................3

Fed. R. Evid. 103(a) (2000) ......................................................................................11

Fed. R. Evid. 702 ...........................................................................................9, 10, 11

Shari Seidman Diamond, *Reference Manual on Scientific Evidence* 362 (National
    Academies Press, 3rd ed. 2011)........................................................................18

U.S. Census Bureau, *A Compass for Understanding and Using American
    Community Survey Data: What General Data Users Need to Know* U.S.
    Government Printing Office, Washington, DC, 2008............................................24

U.S. Census Bureau, *A Compass for Understanding and Using American
    Community Survey Data What PUMS Data Users Need to Know*, U.S.
    Government Printing Office, Washington, DC, 2009............................................19

LEGAL_US_E # 136163562.5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data What Researchers Need to Know*, U.S. Government Printing Office, Washington, DC, 2009.....................................................................................19

## MEMORANDUM OF LAW

Defendants Personnel Staffing Group, LLC ("MVP") and Gold Standard Baking, Inc. ("GSB") (collectively, "Defendants") respectfully request that the Court exclude from evidence the declarations and testimony of Plaintiffs' proposed expert witness, Marc Bendick, Ph.D. ("Dr. Bendick") submitted in support of Plaintiffs' Motion for Class Certification.

## I.    INTRODUCTION

This Court must, as the U.S. Supreme Court has cautioned, "make certain that [Dr. Bendick], whether basing [his] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in [his] field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Dr. Bendick has failed to employ such intellectual rigor to his work in this case. Instead, his work is exactly the type of unreliable scientific testimony that the Court should exclude.

As described more fully below and in the declaration of Carole Amidon, Ph.D., Dr. Bendick's two foundational conclusions are fatally flawed. In arriving at his estimate of Expected Representation of Non-Hispanic African Americans, Dr. Bendick:

- Failed to verify the completeness of the primary source of address data for establishing his reasonable recruitment area and ultimately relied on an incomplete data set that had been compiled by Plaintiffs' counsel from what was likely more than one set of data that had been produced by MVP;

- Failed to critically evaluate work that he outsourced to individuals whom Plaintiffs have not disclosed as experts in this case, and whose work could not be replicated;

- Failed to include geographic areas potentially relevant to his "reasonable recruitment area" analysis; and

1

- Failed to calculate or report margins of error underlying his use of small-sample survey data.

In arriving at his estimates of Actual Representation of Non-Hispanic African Americans, Dr. Bendick:

- Failed to assign addresses and estimate the probability of being Non-Hispanic African American to a large portion of GSB referrals and therefore underestimates the Non-Hispanic African American GSB referrals;

- Failed to calculate correctly his own estimates of Actual Representation and instead significantly understated those estimates in his declarations before the Court;

- Failed to investigate the reasons for GSB referrals in the source data that did not have address information and then uncritically included the associated work hours in his estimated shortfalls; and

- Failed to rely on the same Bureau of Census data sets that he used to arrive at his estimates of Expected Representation and instead performed an unreliable "apples to oranges" comparison to arrive at his shortfall conclusions.

The end result of this approach was two severely flawed and unreliable estimates on which Dr. Bendick based every one of his other principal conclusions. His analysis is a house of cards with an inadequate foundation. It fails to meet minimum scientific standards and should be stricken.

## II.     BACKGROUND

The background in this case is extensive. The facts below relate only to the Motion to Strike Dr. Bendick's Declaration.[1] Defendants respectfully refer the Court to the Statement of Facts in Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed contemporaneously with this memorandum, for a broader discussion of the case.

### A.     Dr. Bendick's Delayed Production and the Need to Correct His Initial Declaration.

Dr. Bendick's original Declaration was first disclosed as an exhibit to Plaintiffs' motion for class certification, on March 28, 2018.[2] Dr. Bendick did not provide at that time all of the facts that he considered in forming his opinions, as required by Fed. R. Civ. P. 26(a)(2)(B)(ii). MVP issued a subpoena seeking those facts and data on April 11, 2018.[3] Among other things, MVP's counsel was seeking the data file referred to in paragraph 12 of his declaration, which is the foundation for his estimate of Expected Representation of non-Hispanic African Americans. Dr. Bendick initially responded to the subpoena on April 27, 2018 with what turned out to be an incomplete set of documents and data.[4] On May 23, 2018, MVP's counsel notified Plaintiffs' counsel about obvious deficiencies in Dr. Bendick's production.[5] He had not produced information from which his analysis could be replicated. He provided data with values differing from those identified in his Declaration. And he failed to produce several key categories of information on which he purportedly relied, including any data file containing the information referred to in the first sentence of paragraph 12 of his declaration.

---

[1] Throughout this memorandum, the Revised Declaration of Marc Bendick, Jr., Ph.D (May 31, 2018) is cited as "Bendick Decl." and is referred to as Dr. Bendick's "Declaration". Dr. Bendick's Declaration is attached as part of Exhibit C to the Declaration of Elliot Richardson ("Richardson Decl."), which in turn is attached hereto as Exhibit 1.
[2] *See* ECF 557-1, Ex. 8; Richardson Decl. ¶ 2.
[3] Richardson Decl. ¶ 3, Ex. A.
[4] *Id.* at ¶ 4, Ex. B.
[5] *Id.* at ¶ 5, Ex. C.

Dr. Bendick responded on June 1, 2018. He provided a "Revised" Declaration and "CORRECTED" data that he adjusted to address errors identified by MVP's counsel.[6] He produced an additional subset of the responsive information that was omitted from his initial response, and he refused or otherwise failed to produce other outstanding responsive information. With the corrections to his original declaration, Dr. Bendick's estimated hours shortfall figures materially decreased.[7] On June 4, 2018, MVP counsel notified Plaintiffs' counsel that Dr. Bendick's responses remained deficient because he failed to produce key data files, mischaracterized the content of one of the files he did produce, and therefore had failed to identify the source of vital data on which he relied.[8] Without this information, it was impossible to replicate Dr. Bendick's work.

Dr. Bendick again responded in piecemeal fashion. On June 5, 2018, Plaintiffs' counsel confirmed that Dr. Bendick had not produced all of the computer code on which his analyses were based.[9] They did not explain why or commit to producing the remainder of that code. MVP's counsel responded the same day, asking whether Dr. Bendick was refusing to provide the complete code.[10] Plaintiffs' counsel refused to produce the remainder of the code because it was "proprietary" and, in their opinion, unnecessary to replicate Dr. Bendick's work.[11]

In the same email, Plaintiffs' counsel asserted that Defendants provided in 2014 the home addresses of the 18,191 individuals listed in the file Dr. Bendick used to determine the reasonable recruitment area for MVP's Cicero office. MVP's counsel responded that Defendants never produced a data file containing 18,191 entries, let alone one containing 18,191 addresses,

---

[6] *Id.*
[7] Transcript of the Deposition of Marc Bendick, Jr, Ph.D (June 21, 2018) ("Bendick Dep.") 103:22-106:16. The Bendick Dep. is attached hereto as Exhibit 2.
[8] Richardson Decl. ¶ 5, Ex. C.
[9] *Id.* at ¶ 6, Ex. D.
[10] *Id.*
[11] *Id.*

and asked Dr. Bendick to identify the data file or files he used to create the file with 18,191 entries.[12] Plaintiffs' counsel then explained that Dr. Bendick relied on a data file *they compiled* in 2014 from original data files produced in discovery. On June 14, 2018—65 days after MVP issued the subpoena and a week before his deposition—Dr. Bendick produced the Excel data file with 18,191 entries.[13] At the deposition on June 21, 2018, Defendants learned that Dr. Bendick also failed to produce additional responsive computer code,[14] which was produced days after his deposition.[15]

### B. Dr. Bendick Did Not Adequately Supervise Work Performed By Others That Was Critical to his Conclusions.

The opinions expressed in Dr. Bendick's Revised Declaration depend on the work of three other individuals, and he did not adequately supervise that work.

Because there are no available data regarding the race of laborers referred by MVP, Dr. Bendick developed estimates of race, though his approach to doing so for Expected Representation differed significantly from his approach for Actual Representation. To arrive at his estimate for Expected Representation he relied on a data file containing information regarding 18,191 individuals referred from MVP's Cicero office (hereinafter referred to as the "List of 18,191 Referrals") to define a reasonable recruitment area. Dr. Bendick did not in any way supervise the compilation of those data from data files produced by MVP in discovery, however. Bendick Dep. 55:11-56:22; 64:18-67:14; 69:15-72:9. Plaintiffs' counsel represents that they compiled this list from data produced by MVP. *Id.* at 56:4-15; 64:18-66:1. Unbeknownst to Dr. Bendick, however, the underlying data produced by MVP contained multiple additional

---

[12] *Id.*
[13] *Id.*
[14] Bendick Dep. 58:9-60:20.
[15] Richardson Decl. ¶ 7, Ex. E.

addresses for many of the individuals listed, as described more fully below.[16] The List of 18,191 Referrals excluded many of these addresses and arbitrarily labeled certain addresses included in the list as "Alternative Address."

Despite his testimony that "it would be important to use all available data,"[17] Dr. Bendick did not inquire about the meaning of "alternative address" or ask Plaintiffs' counsel whether the List of 18,191 Referrals included all of the relevant information. Instead, he assumed based on an "implicit understanding" that he had been provided with all of the available data Plaintiffs' counsel received from MVP, disregarded all of the addresses listed as "Alternate Addresses," and included in his analysis only those addresses that had been arbitrarily assigned to the "Address" column. Bendick Dep. 55:11-56:22; 69:15-70:23.

Next, Dr. Bendick provided the unverified List of 18,191 Referrals to an individual named Warren Glimpse. Mr. Glimpse has not been disclosed as an expert. Nor have Plaintiffs' counsel provided any disclosures regarding his training or background. Dr. Bendick asked Mr. Glimpse to geocode the addresses in the incomplete List of 18,191 Referrals using data from the U.S. Census Bureau's American Community Survey ("ACS") to identify the Public Use Microdata Area ("PUMA") corresponding to each address. Bendick Dep. 112:4-17; 132:3-13. Dr. Bendick also relied on Mr. Glimpse for the critical task of using SQL computer code to calculate the demographic composition of each PUMA in which any of those addresses were located, limited to the individuals in each PUMA that were in Dr. Bendick's view "likely to be qualified, available, and interested in MVP Referrals to Gold Standard Baking." Bendick Decl., Attachment C, Tables 1A and 1B; Bendick Dep. 112:4-113:15.

---

[16] Declaration of Carrie M. Amidon, Ph.D ("Amidon Decl."), attached hereto as Exhibit 3, ¶ 19; Richardson Decl. ¶¶ 9; Bendick Dep., Ex. 2 at I.D.
[17] Bendick Dep. 21:19-24.

Dr. Bendick provided Mr. Glimpse with direction to accomplish this task, including defining the factors by which the PUMA demographics should be limited. Bendick Dep.113:16-21; 115:3-20; 139:12-17. But Dr. Bendick does not write in SQL code and was unable to answer several basic questions about SQL code during his deposition. *Id.* at 119:8-24; 137:12-140:24. Dr. Bendick is, however, capable of using the PUMS data on which Mr. Glimpse relied. *Id.* 132:8-13. He acknowledged that working with PUMS data is "potentially error-prone." Still, he opted not to undertake the process of verifying Mr. Glimpse's work, which he characterized as "slow" and "laborious." *Id.* at 132:3-13. As described below, Mr. Glimpse's work could not be replicated.

Finally, Dr. Bendick relied on an individual named John Miller to perform statistical calculations using SAS computer code underlying the opinions in his Revised Declaration.[18] Bendick Dep. 30:22-36:8. Dr. Bendick relied on Dr. Miller, he said, because Dr. Miller is an expert in the area of statistics and is adept at programming in the SAS language. *Id.* at 31:20-33:15. Dr. Miller, like Mr. Glimpse has not been disclosed by Plaintiffs as an expert.

### C. Dr. Bendick's Declaration

Dr. Bendick's Revised Declaration describes his six principal conclusions.[19] The first two conclusions (the "Foundational Conclusions") form the basis of the remaining four (the "Dependent Conclusions"). Both are fundamentally flawed.

Dr. Bendick's first Foundational Conclusion is his estimated expected representation of Non-Hispanic African Americans among MVP referrals to Gold Standard Baking ("GSB") during 2009-2015 of 29.5% (the "Expected Representation"). This is a gross estimate of

---

[18] Although this SAS code was incontrovertibly responsive to MVP's subpoena seeking all code relied on for Dr. Bendick's report, he failed to produce it until June 24, 2018—several days *after* his deposition. Richardson Decl. ¶ 7.

[19] Dr. Bendick's initial report contained information that he subsequently acknowledged was incorrect. Bendick Dep. 9:2-12:9; 87:11-88:18; 103:5-106:16.

representation in the labor market, not an estimate of the race of individual laborers who sought work through MVP's Cicero office. In the process of reaching this conclusion, however, Dr. Bendick: (1) did not validate or fully understand the underlying data he used; (2) relied on without validating a non-expert's non-replicable programming logic; (3) excluded roughly half of the relevant PUMAs; and (4) failed to calculate determinable margins of error associated with his use of survey data.

Dr. Bendick's second Foundational Conclusion is his estimate of the percentage of laborers actually referred by MVP's Cicero office to GSB in each of the years 2009, 2010, 2011, 2012, 2013 and 2015 who were Non-Hispanic African Americans (the "Actual Representation"), as set forth in the table within Paragraph 7.b of his Declaration. Bendick Decl. ¶ 7.b. In contrast to his first Fundamental Conclusion, this involved his effort to attribute race and ethnicity to each person assigned to GSB. In the process of reaching this conclusion, however, Dr. Bendick: (1) failed to estimate the race of individuals for whom the data set he received from Plaintiffs' counsel did not include an address, which was more than a quarter of GSB referrals, and roughly half of GSB referrals in the years for which he claims to have found the greatest shortfalls; (2) used a formula that assigned erroneous values to that portion of the referrals; (3) factored in without inquiry work hours that could not have been reflected temporary labor; and (4) relied on conflicting sources for data comparisons in contravention of well-accepted scientific guidance.

Dr. Bendick's four Dependent Conclusions are that: (1) a comparison of his Expected Representation to his Actual Representation figures reveals a shortfall for Non-Hispanic African Americans in years 2009-2014; (2) those shortfalls are statistically significant for years 2009-2013; (3) the total work hours of shortfall from 2009 to 2014 is 203,331, or 122.3 hours per year for each Non-Hispanic African American job seeker; and (4) the estimated Actual

Representation of 30.6% in 2014-2015 supports his shortfall analysis because it is close to his estimate of 29.5% Expected Representation. Each of these dependent conclusions stems from and depends upon the reliability of Dr. Bendick's flawed Foundational Conclusions.

### D. Dr. Amidon

MVP retained Carole M. Amidon, Ph.D. to review Dr. Bendick's work in this case. Dr. Amidon specializes in computer analysis of large databases, labor economics, applied econometrics, and statistical analysis. Amidon Decl. ¶ 1. She earned a Ph.D. in Economics from the University of Illinois, Urbana-Champaign, and for the past 15 years has prepared analyses for plaintiffs, defendants, and risk assessment. *Id.* at ¶ 2. She is a member of the American Economic Association and the National Association of Forensic Economics, and frequently presents at seminars on the topics of statistical techniques, data and modeling, compensation analysis, and calculating damages. *Id.* at ¶ 3; ¶ 5. Dr. Amidon has testified in administrative and court proceedings, and has never been rejected as an expert qualified to testify in her areas of expertise. *Id.* at ¶ 4. As described below, Dr. Amidon has set forth in her declaration the myriad ways in which Dr. Bendick has failed to adhere to accepted professional standards applicable to the work he has done for Plaintiffs in this case.

## III. ARGUMENT

Courts serve a vital "gatekeeping" role when it comes to expert testimony, especially where the expert proposed to testify in a field of science such as statistics. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-97 (1993) ("*Daubert*").[20] A judge "exercises more control over experts than over lay witnesses" because "[e]xpert evidence can be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (quoting Jack Weinstein, *Rule 702 of the Federal Rules of*

---

[20] *See also Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); Fed. R. Evid. 702.

*Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). It is the courts' "responsibility to determine whether [the] experts' proposed testimony amounts to 'scientific knowledge,' constitutes 'good science,' and was 'derived by the scientific method.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995) (*Daubert II*). "[S]omething doesn't become 'scientific knowledge' [and thus admissible as expert testimony] just because it's uttered by a scientist." *Id.* Because "the district court must ensure that it is dealing with an expert, not just a hired gun" it is the Court's job to determine whether expert testimony is supported by appropriate expertise, and reliable data and methods.[21] *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996).

The Court must "ensure that any and all scientific testimony . . . [or evidence admitted] is not only relevant, but reliable." *Kumho Tire*, 526 U.S. at 147, citing *Daubert*, 509 U.S. at 589. In *Daubert*, the Supreme Court established "exacting standards of reliability [that expert] evidence must meet." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).[22] First, a court must engage in a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. An expert's testimony is inadmissible unless: (1) it is based on a fair rendition of the facts of the case;[23] (2) it is premised on "sound science" subject

---

[21] Under the Federal Rules of Evidence, an expert's testimony is only admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

[22] This standard applies to the class certification inquiry. *See Comcast v. Behrend*, 569 U.S. 27, 36-38 (2013); *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811-13 (7th Cir. 2012) (*Daubert* ruling was required for expert's testimony critical to class certification); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) (court must assess "all of the relevant evidence admitted at the class certification stage" including the probative value of any offered expert testimony); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (post-*Wal-Mart*, *Daubert* analysis is appropriate at class certification stage).

[23] See Fed. R. Evid. 702; *Joiner*, 522 U.S. at 144-45.

to "objective, independent validation;"[24] and (3) the expert has reliably applied those "sound" scientific principles and methods to the facts of the case.[25] "[T]he expert's testimony must be reliable at each and every step or else it is inadmissible."[26] Therefore, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, *the facts underlying the expert's opinion*, the link between the facts and the conclusion, et alia."[27]

The Supreme Court identified several key factors to consider in this inquiry, including: whether the theory or technique can be tested and replicated; whether the theory or technique has been subjected to peer review and publication; the "known or potential rate of error"; whether there are "standards controlling the technique's operation"; and whether a theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho Tire*, 526 U.S. at 150 (citing *Daubert*, 509 U.S. at 592-94.). Where the opposing party "call[s] into question" an expert's opinion by presenting "conflicting . . . literature," and the expert does not offer scientific literature on point, the expert's opinion should be excluded.[28]

Plaintiffs must prove that Dr. Bendick's Declaration meets these standards by a preponderance of the evidence. *Krik v. Exxon Mobil Corp.,* 870 F.3d 669, 673 (7th Cir. 2017). Plaintiffs cannot satisfy their burden because Dr. Bendick's Declaration is not reliable, as set forth below.

---

[24] *Daubert II*, 43 F.3d at 1316-17.

[25] *Id.*; Fed. R. Evid. 702. *See also Cano v. Cont'l Airlines Inc.*, 193 F. App'x 664, 666 (9th Cir. 2006) ("Appellants did not show that [the expert] reliably applied scientific principles and methods to the facts of this case.").

[26] *Sullivan v. Worley Catastrophe Servs., LLC*, No. 11-2597, 2013 WL 5530277, at *11 (E.D. La. Oct. 7, 2013), *aff'd,* 591 F. App'x 243 (5th Cir. 2014) (citing *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 724-25 (5th Cir. 2009); *Paz v. Brush Eng'd. Mat'ls., Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352, 355 (5th Cir. 2007)).

[27] *Id.* (citation omitted) (emphasis in original).

[28] *Tanner v. Westbrook*, 174 F.3d 542, 546-48 (5th Cir. 1999), *superseded in part by rule on unrelated grounds by* Fed. R. Evid. 103(a) (2000) (court abused discretion in admitting expert testimony where the opposing party offered conflicting literature and the expert did not offer "literature directly addressing the causation issue"). When an expert's opinions are based on a review of literature, not the expert's own research, heightened scrutiny is required. "If the proffered expert testimony is not based on [the expert's] independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Daubert II*, 43 F.3d at 1317-18.

A.    **Dr. Bendick's Estimate of Expected Representation is Not Reliable.**

Dr. Bendick's first Foundational Conclusion is his estimate of the Expected Availability of Non-Hispanic African Americans. As described in Section II.B, his estimate derives from ACS data reflecting the demographic composition of each PUMA in which certain addresses found in the List of 18,191 Referrals were located. As shown in Dr. Bendick's own Tables 1A and 1B, the demographic composition of PUMAs varies widely. For example, on his own Table 1A the percentage of Black Non-Hispanic varies from as low as 0.9% in one PUMA to as high as 98.2% in another. Therefore, working from a proper and complete set of addresses associated with MVP's Cicero office during the appropriate time period is critical to a reliable estimate of expected availability of Non-Hispanic African Americans using his stated approach. Equally critical is the proper use of the Census Bureau's ACS data, not to mention a candid description of how it should be interpreted. In reaching this conclusion, however, Dr. Bendick failed to verify his primary source data, relied without validation on a non-expert's non-replicable programming logic, excluded roughly half of the relevant geographic area, and failed to calculate and report margins of error as directed by scientific standards.

1.    Dr. Bendick Failed to Verify The Primary Source Data Behind His "Reasonable Recruitment Area" and, Therefore, His Expected Availability Estimate, and That Data Set Was Incomplete.

The primary source data for Dr. Bendick's Foundational Conclusion about the "Reasonable Recruitment Area" and, therefore, Expected Availability is addresses found in the List of 18,191 Referrals. In his Declaration, Dr. Bendick implied that the List of 18,191 Referrals came from "Defendants."[29] At his deposition, however, Dr. Bendick admitted that the List of 18,191 Referrals had been compiled by Plaintiffs' counsel purportedly based on other data

---

[29] Bendick Decl. ¶ 12 ("In 2014, Defendants provided the home addresses of 18,191 job seekers assigned out of the MVP Cicero Office.").

provided by MVP.[30] Bendick Dep. 55:4-56:15. Dr. Bendick had no role in the process of creating the List of 18,191 Referrals, never saw the data files from which it was compiled, does not know what information those underlying files contained, and is not aware of the program or process that Plaintiffs' counsel used to create it. *Id.* at 64:18-67:14.

Rather than inquire about these issues, Dr. Bendick assumed pursuant to an "implicit understanding" that Plaintiffs' counsel provided him with all of the information they had with respect to the underlying data. *Id.* at 56:16-22. This alone is reason to question Dr. Bendick's conclusion. *See EEOC v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1286 (N.D. Ill. 1986) (as the foundation on which the analyses rest, assumptions "can be far more important than the numerical complexities and results of the analysis"); *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (an expert's reliance on data provided by a plaintiff, without conducting independent verification, "gives rise to 'common-sense skepticism' regarding the expert's evaluation). Moreover, it is the policy of the American Economic Association, an organization to which Dr. Bendick belongs, to publish papers only if the data used in the analysis are clearly and precisely documented and are readily available to any researcher for purposes of replication. Amidon Decl. ¶ 35, n.37. Dr. Bendick has not clearly and precisely documented how the addresses that provide the basis for his "Reasonable Recruitment Area" were determined.

Because he did not verify or otherwise inquire about the List of 18,191 Referrals and the data from which it was compiled, Dr. Bendick also did not understand the nature of the cornerstone data underlying his first Foundational Conclusion. As it turns out, he used incomplete data. For example, the List of 18,191 Referrals contains columns labeled "Address"

---

[30] The underlying data, produced by MVP, included a list of 64,142 referrals from the Cicero office over a timeframe broader than the timeframe relevant to this litigation. Richardson Decl. ¶¶ 9; Bendick Decl. Ex 2 at I.D.; Amidon Decl. ¶¶ 14-19.

and "Alternate Address."[31] Dr. Bendick opted to rely for Mr. Glimpse's geocoding exclusively

on the information in the "Address" column (and not on any "Alternate Address" information),

without asking Plaintiffs' counsel any questions about the differences between the two columns.

*Id.* at 70:1-73:14. As a result, he was not aware that the addresses listed in the "Alternate

Address" column were not designated in the data produced by MVP as "alternate" to (or in any

way less reliable than) the addresses that Plaintiffs' counsel chose to include in the "Address"

column on which Dr. Bendick and Mr. Glimpse exclusively relied.[32] Bendick Dep. 70:1-73:14.

Dr. Bendick was also unaware that the underlying data provided by MVP contained more than

two addresses for many of the job seekers listed, which Plaintiffs' counsel excluded from the List

of 18,191 Referrals.[33] Bendick Dep. 56:16-22.

Indeed, the List of 18,191 Referrals itself reveals that there are 3,498 individuals with

"Alternative" addresses that are different from the information contained in the Address column,

*and which were not accounted for by Dr. Bendick in defining the "Reasonable Recruitment*

*Area."* Amidon Decl. ¶ 18. Furthermore, within the data files produced by MVP in discovery

there are an additional 5,710 addresses associated with the individuals included in the List of

18,191 Referrals *that are not contained in the data file used by Dr. Bendick and not accounted*

*for in the definition of the "Reasonable Recruitment Area*." *Id.* at ¶ 19.

The definition of his "Reasonable Recruitment Area" is the cornerstone for his 29.5%

Expected Representation. Thus, Dr. Bendick's entire analysis is poisoned at the root, cannot be

relied on, and is inadmissible. *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23-24 (2d

Cir. 2017) (expert's report properly excluded where expert "did not independently verify" the

data on which he relied, and instead "simply input the numbers he was given").

---

[31] Amidon Decl. ¶ 16; Bendick Dep., Ex. 2 at III.A.Decl.
[32] Amidon Decl. ¶ 17; Bendick Dep., Ex. 2 at I.D; Richardson Decl. ¶ 9.
[33] Amidon Decl. ¶ 19; Bendick Dep., Ex. 2 at I.D; Richardson Decl. ¶ 9.

2.     Non-Expert Warren Glimpse's Non-Hispanic African-American PUMA
         Calculations Cannot Be Replicated

Scientific expert testimony must also be replicable in order to be admissible. *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("Someone else using the same data and methods must be able to replicate the result."). As discussed above, Dr. Bendick relied on Mr. Glimpse to use SQL code to calculate the estimated racial and ethnic composition of the subset of individuals in each PUMA who Dr. Bendick believed were likely to be qualified, available and interested in referrals from MVP. Mr. Glimpse performed these calculations based on an incomplete subset of addresses from the List of 18,191 Referrals, which itself was an incomplete subset of the address information that MVP disclosed to Plaintiffs. Dr. Bendick directed Mr. Glimpse's work, but he does not write in SQL code, was unable to answer questions about SQL code during his deposition (Bendick Dep. 118:15-22; 119:17-24), and did not perform any validation of the work that Mr. Glimpse performed. *Id.* 134:2-5. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613, 615 (7th Cir. 2002) (affirming exclusion of expert where his assistants "exercise[d] professional judgment that is beyond the expert's ken" and the expert "himself lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen and applied").

During Dr. Bendick's deposition, counsel followed his instructions to filter the 2012-2013 ACS data regarding PUMA 3408, the first one listed in his Tables 1A and 1B based on the same criteria that Dr. Bendick claimed Mr. Glimpse applied to the same data. *Id.* at 121:5-136:6. Although the process yielded the same figure listed in Dr. Bendick's Table 1A for total persons in the PUMA (18,413)—which confirmed that the same limiting criteria were applied—it did not replicate the number of Black, Non-Hispanic persons in that same PUMA (Column I). *Id.* Dr. Bendick did not have an explanation for the error. *Id.* In response to MVP's subpoena, Dr.

15

Bendick produced the programing logic that Mr. Glimpse used to generate the figures in columns G-J of Tables 1A and 1B (the "Glimpse Code").[34] Dr. Amidon applied the Glimpse Code to the ACS data that Mr. Glimpse relied on for both tables. Amidon Decl. ¶ 22. Dr. Amidon was able to replicate the totals for Columns G and H, but could not replicate the totals for Column I or J. *Id.* at ¶¶ 22-23.

Because Mr. Glimpse's programming calculations cannot be replicated, the tables on which Dr. Bendick relies for his Foundational Conclusion about Expected Representation is inadmissible. *Zenith Electronics*, 395 F.3d at 419; *see also Bowman for J.B. v. Int'l Bus. Machines Corp.,* No. 1:11-CV-0593 RLY-TAB, 2013 WL 12290833, at *6 (S.D. Ind. Aug. 16, 2013) (excluding non-replicable expert testimony); *Harris v. Clark*, No. 06-C-529, 2009 U.S. Dist. LEXIS 63643, at *11 (E.D. Wis. June 16, 2009). ("If an expert witness cannot explain how he arrived at his conclusions, he will not be allowed to give expert testimony.").

### 3. Bendick's Analysis Ignores Many Relevant PUMAs.

Even after excluding from his analysis thousands of relevant addresses that Plaintiffs' counsel arbitrarily categorized as "alternate," as discussed above in Section III.A.1, Dr. Bendick opted to also exclude every other address from the List of 18,191 Referrals that was located within any of 30 specific PUMAs in the Chicago area for the 2010 data and 23 specific PUMAs in the 2000 data. Bendick Decl. ¶¶ 14-16; Attachment C, Tables 1A and 1B. Dr. Bendick's Declaration offers no meaningful explanation for his decision to exclude from the so-called "reasonable recruitment area" over 60% of the PUMAs in which his improperly narrowed set of addresses were located in 2010, and over half of the PUMAs in which that set of addresses were located in 2000. *Id.* Had Dr. Bendick included these arbitrarily-excluded PUMAs in his

---

[34] Richardson Decl. 5, Ex. C.

calculation, his estimated percentage of Black-Non Hispanic individuals would have decreased. Amidon Rep. ¶ 31.

Moreover, Dr. Bendick failed to consider yet another source of address information that would have affected his analysis. In 2017, MVP produced a set of seven files containing updated address information for all laborers referred by MVP's Cicero Office to any client, for each year from 2009 to 2015 (the "Yearly Cicero Address Files").[35] These files supplemented the data produced by MVP in 2014 and included the same date for the balance of 2014 and all of 2015.[36] Had Dr. Bendick considered these data, he could have provided an Expected Representation estimate for each year, *corresponding to his yearly estimates of Actual Representation*, instead of making one estimate for the entire seven-year timeframe with only data from 2009 through 2014. Amidon Decl. ¶ 32. Because he failed to prepare yearly estimates and consider data covering the entire time period, Dr. Bendick's comparison of an aggregate Expected Representation to his yearly Actual Representation figures is unreliable. *Id.*

4.     Dr. Bendick's Failure to Report Margins of Error Invalidates His Entire Analysis.

Dr. Bendick directed Mr. Glimpse to rely on data from the ACS to calculate the racial and ethnic characteristics of a subset of the population residing in each PUMA containing any of the incomplete addresses from the List of 18,191 Referrals. Bendick Decl. ¶¶ 11-12; Bendick Dep. 89:24-92:19; 112:8-115:9. Each PUMA has a minimum population of 100,000. Amidon Dec. ¶ 25. But the ACS data are based on a survey of a small sample of that population. *Id.* For example, between 2009 and 2013, the ACS surveyed a total of *only 3,017 individuals* from PUMA 3408, the first-listed PUMA in tables 1A and 1B of Dr. Bendick's Declaration. *Id.* Because the ACS survey is a sample of the population rather than a *census* of the population,

---

[35] Richardson Decl. ¶ 17
[36] *Id.* ¶¶ 14-15.

there is an error rate around the estimates of the number of individuals in each PUMA with the characteristics that Dr. Bendick claims he directed Mr. Glimpse to use. *Id.* ¶¶ 24-30.

When an expert relies on sampling for a statistical analysis, it is vital that she (or he) calculate and report the error rates. *Id.* ¶ 24. Dr. Bendick did neither. Although he testified that error rates are within his realm of expertise, Dr. Bendick claimed that calculating the error rates for the ACS data would be "very difficult" and a "major computational and conceptual challenge" so he did not calculate them and did not ask Mr. Glimspe to calculate them. Bendick Dep. 142:2-18; 143:8-13; 144:5-12; 149:23-150:6. He then testified that it was "essentially not possible to calculate" the error rate for many of these figures, and that he did not think "statistical theory gives you a way to come up with an error rate, for example, for the totals or the averages." *Id.* at 143:8-20. Dr. Bendick ultimately admitted that he did not know whether one could calculate an error rate for these figures and would "have to check with an expert statistician, like Dr. John Miller" to be sure. *Id.* But he confirmed that there was "absolutely" a margin of error associated with them. *Id.* at 149:1-22.

The Federal Judicial Center's *Reference Manual on Scientific Evidence*, which Dr. Bendick cites as authority in his Declaration, provides that "[t]he ability to quantitatively assess the limits of the likely margin of error is unique to probability sample surveys, but an expert testifying about any survey should provide enough information to allow the judge to evaluate how potential error, including coverage, measurement, nonresponse, and sampling error, may have affected the obtained pattern of responses." [37] The U.S. Bureau of Census has issued guidance regarding how to calculate the margins of error associated with the ACS data:

> Sampling error can be expressed quantitatively in various ways, four of which are presented in this appendix—standard error, margin of error, confidence interval, and coefficient of variation. As the ACS

---

[37] Shari Seidman Diamond, *Reference Manual on Scientific Evidence* 362 (National Academies Press, 3rd ed. 2011)

estimates are based on a sample survey of the U.S. population, information about the sampling error associated with the estimates must be taken into account when analyzing individual estimates or comparing pairs of estimates across areas, population subgroups, or time periods. The information in this appendix describes each of these sampling error measures, explaining how they differ and how each should be used. It is intended to assist the user with analysis and interpretation of ACS estimates. Also included are instructions on how to compute margins of error for user-derived estimates. [38]

The ACS user guidelines also state that "the user must calculate the [margin of error] for these derived estimates. The [margin of error] helps protect against misinterpreting small or nonexistent differences as meaningful." [39] But Dr. Bendick opted to ignore this scientific literature, and has offered no authority contradicting it. [40] Using the approach suggested by the Census Bureau, Dr. Amidon had no trouble calculating the margins of error around the estimated percent of Black Non-Hispanic individuals in each of the PUMAs specifically identified in Dr. Bendick's Table 1A. Amidon Decl. ¶ 30. These calculations reveal substantial margins of error which render Dr. Bendick's 29.5% Expected Representation estimate misleading and unreliable. *Id.*

### B. Dr. Bendick's Estimates of the Actual Representation of Non-Hispanic African Americans Among GSB Referrals Are Incorrectly Calculated and Unreliable.

Dr. Bendick's second Foundational Conclusion is his estimate of the Actual Representation of Non-Hispanic African Americans among individuals referred to GSB from MVP's Cicero office, which are based on his effort to attribute race and ethnicity to individuals in the population. These estimates too are based upon his use of addresses produced by MVP and

---

[38] U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data What PUMS Data Users Need to Know* U.S. Government Printing Office, Washington, DC, 2009, Appendix 3, A-11.
[39] U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data What Researchers Need to Know* U.S. Government Printing Office, Washington, DC, 2009, Appendix 3, A-14.
[40] *Tanner,* 174 F.3d at 546-48 (where the opposing party "call[s] into question" an expert's opinion by presenting "conflicting . . . literature," and the expert does not offer scientific literature on point, the expert's opinion should be excluded).

data made available by the Census Bureau, but he inexplicably uses different Census Bureau data than he used to estimate Expected Representation.

In reaching this Foundational Conclusion, Dr. Bendick failed to assign addresses to (and therefore estimate race for) *more than a quarter of GSB referrals*, used a Microsoft Excel formula that assigned erroneous values to that entire population, included without investigation work hours that may not have been for temporary labor, and relied on conflicting sources for data comparisons in contravention of authoritative scientific guidance.

        1.    <u>Dr. Bendick Failed to Assign Addresses to (and Therefore Estimated Race for) Many GSB Referrals and Underestimated the Percentage of Non-Hispanic African-Americans Referred to GSB.</u>

Dr. Bendick's estimates regarding Actual Representation are purportedly based on a Microsoft Excel file that he produced on June 1, 2018, which contained data reflecting 11,255 referrals to GSB between October 2009 and the end of 2015 (the "CORRECTED Bendick Table").[41] The CORRECTED Bendick Table includes work hours for each referral, addresses for *some* referrals, and Dr. Bendick's estimated likelihood that the individual referred is Non-Hispanic African American for an even smaller subset of referrals.[42] The data in the CORRECTED Bendick Table regarding each individual's name and work hours came from seven files produced by MVP (the "Yearly GSB Hours Files"), but those files did not contain the individuals' addresses.[43] But Dr. Bendick could not identify the source of the address information that had been appended to a subset of referrals in the CORRECTED Bendick Table. Bendick Dep. 151:8-160:24. He testified that he thought the Yearly GSB Hours Files contain that address information, but they do not.[44] Bendick Dep. 155:5-156:10. Dr. Bendick was also unable

---

[41] Bendick Dep., Ex. 2 at III.D; Amidon Decl. ¶ 34; Richardson Decl. ¶ 6 and Ex. C.
[42] Bendick Dep., Ex. 2 at III.D; Amidon Decl. ¶¶ 35-44; Richardson Decl. ¶ 6 and Ex. C.
[43] *See* Bendick Dep., Ex. 2 at II.B; Richardson Decl. ¶ 12.
[44] *Id.*

to explain why many of the referrals in the CORRECTED Bendick Table did not contain any address information. Bendick Dep. 106:7-14; 161:1-14. As a result of Dr. Bendick's inability to explain the source of the address information, the creation of the CORRECTED Bendick Table cannot be replicated, and is therefore unreliable. Amidon Dec. ¶ 35.

Dr. Bendick represents in his Revised Declaration that he computed the probability (his manner of attributing race/ethnicity) that each of 8,278 of the 11,255 referrals (73.5%, he says) in the CORRECTED Bendick Table were Non-Hispanic African American. Bendick Dec. ¶ 27. But he did not even calculate the probability for that percentage overall. It turns out that he failed to calculate a probability for 130 referrals with an address. Amidon Dec. ¶ 36. After calculating a probability for 72.4% of the total referrals, Dr. Bendick calculated the average probabilities for each of the seven years. *Id.* at ¶¶ 36-37. But Dr. Bendick misleads the reader by hiding the fact that the percentage of referrals for whom he had address information (and, therefore, for whom he calculated a probability of being non-Hispanic African American) was different for each referral year. It was 41.94% in 2009 and increased year by year, up to 86.78% in 2015. *Id.* at ¶ 37; Table 4.

The fact that Dr. Bendick failed to calculate a probability as to the race of the remaining 27.6% of the referrals in the CORRECTED Bendick Table substantially diminishes the reliability of his estimate across the seven years at issue. It does so in two ways: (1) the formula that he used to calculate the Actual Representation for each year assigned a probability of *0% Non-Hispanic African American for all 3,107 referrals* for whom he did not calculate a specific probability; and (2) he failed to account for the significant possibility that the subset for which he calculated a probability do not reflect the entire population in any given year. *Id.* ¶ 38.

21

With respect to the first error, Dr. Bendick testified that he intended to include in his average probability calculation only those referrals with an estimated probability of being Non-Hispanic African American. Bendick Dep. 102:15-103:3. But his calculation of the average probability of being Non-Hispanic African American included all 3,107 referrals for which he did not assign a specific probability (based on lack of an address), and *assigned to each of them a probability of 0%*. Amidon Decl. ¶ 40. In other words, Dr. Bendick assumed that 3,107 individuals were not Non-Hispanic African Americans simply because he did not have an address for them in the data provided to him by Plaintiffs' counsel. When Dr. Amidon removed the erroneous 0% values from the calculation, but still relied on the addresses from the source file Dr. Bendick could not identify, the estimated Actual Representation increased by 142% in 2009, by 90% in 2010, by 64% in 2011, by 48% in 2012, by 33% in 2013, by 6.4% in 2014, and by 15% in 2015.  *Id.* ¶ 41; Table 5.[45]

With respect to the second error, the estimated Actual Representation figures—particularly in the early years—are unreliable because the GSB Referrals Data did not include addresses for more than half of the population in the years 2009 and 2010, and for substantial portions of the population in subsequent years. *Id.* Dr. Bendick fails to rule out or attempt to calculate the substantial possibility that his estimates grossly underestimate the representation of Non-Hispanic African Americans among GSB referrals in the earlier years. *Id.* ¶¶ 42-43. For example, if the 58.06% of GSB referrals in 2009 for whom Dr. Bendick's unknown source did not provide an address were similar to the GSB referral population in the years 2014 and 2015, the representation rate for 2009 would be 23%—*more than thirteen times higher* than Dr. Bendick's estimated Actual Representation for that year. *Id.* ¶ 44.

---

[45] In providing these calculations, Defendants do not intend to suggest that the information reflected in Table 5 is a more accurate reflection of the racial composition of individuals who were referred to work at GSB by MVP, as Dr. Bendick's underlying methodology remains unreliable for other reasons, discussed throughout this memorandum.

2. <u>Dr. Bendick Failed to Investigate the Reasons for Referred Employees' Missing Addresses, But Still Included Their Hours in His Estimates.</u>

As discussed above, Dr. Bendick was unable to identify the source of the addresses that had been appended to a subset of referrals in the CORRECTED Bendick Table. He also did not know why so many individuals in the CORRECTED Bendick Table were missing address information. A labor economist employing the "same level of intellectual rigor that characterizes the practice of an expert in [his] field"[46] would have investigated both the source of the addresses within the CORRECTED Bendick Table and the reason so many addresses were missing. Amidon Decl. ¶ 45. Dr. Bendick did neither.

As described above, MVP supplemented its data production in 2017 with two sets of files: the Yearly GSB Hours Files, and the Yearly Cicero Address Files. Had Dr. Bendick compared these two sets of files, he would have learned that some individuals in the Yearly GSB Hours Files were not listed in the Yearly Cicero Address Files. *Id.* He would also have learned that some individuals in the Yearly GSB Hours Files were listed in the Yearly Cicero Address Files without an address. *Id.* For a labor economist, this incongruity warranted further investigation, not blind reliance. *Id.* at ¶¶ 45-46. But Dr. Bendick opted for the latter. *Id.* As a result, he lacked basic knowledge about foundational issues related to key data on which his analysis relied.

3. <u>Dr. Bendick Failed to Investigate the Reasons for Referred Employees' Suspect Hours, But Still Included Them in His Estimates.</u>

In their Motion for Class Certification, Plaintiffs point to evidence that referrals from MVP to GSB are subject to a maximum work period of 90 days.[47] But the GSB Referral Data on which Dr. Bendick relies for his Foundational Conclusion regarding Actual Availability contains

---

[46] *Kumho Tire*, 526 U.S. at 152.
[47] Transcript of the Deposition of Angelica Parra (April 11, 2017), 104:10-14, attached as Exhibit F to the Richardson Decl.

employees with hours that far exceed this period—some totaling over 2,000 hours in a single year. Amidon Decl. ¶ 47. It doesn't take a labor economist to recognize these figures as reflecting the hours of a full-time, regular laborer rather than a temporary laborer. Dr. Bendick noticed these apparently full-time individuals in the GSB Referral Data, but he did not go "into that issue" and did not factor the 90-day rule into his analysis. Bendick Dep. 107:18-108:22. Instead, he included their hours in his calculations without questioning them merely because "they were in the data set." *Id.* at 108:1-22.

4. <u>Dr. Bendick Used Different Data to Calculate the Actual Representation of GSB Approvals Than He Used to Calculate Estimated Representation.</u>

Dr. Bendick's Expected Representation estimate relies on the ACS PUMA data. Amidon Decl. ¶ 48. But his estimate of Actual Representation relies on the Decennial Census. *Id.* Relying on these disparate data sources for elements of the same analysis renders the analysis unreliable. *Id.* Indeed, the Bureau of Census cautions against such an apples-to-oranges approach, stating "every survey uses different methods, which could affect the comparability of the numbers." [48]

Worse yet, in his deposition Dr. Bendick did not appear even to know which source he used. He testified that he used the ACS PUMA data as the source of his calculations. Bendick Dep. 92:12-19. But in his Revised Declaration, Dr. Bendick stated that he used the Decennial Census to estimate the Actual Representation based on the Census block rather than the ACS PUMA data that he had Mr. Glimpse refine to meet his preferred criteria. Bendick Decl. ¶ 27 n.13. By relying on these disparate sources of demographic information for his two Foundational Conclusions, Dr. Bendick departed from the accepted scientific standards, including those described by the Bureau responsible for publishing both data sets. Amidon Decl. ¶¶ 48-50. Therefore, his shortfall analysis is unreliable.

---

[48] U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data: What General Data Users Need to Know* U.S. Government Printing Office, Washington, DC, 2008, page 25.

### C. Dr. Bendick's Dependent Conclusions Are All Unreliable.

Dr. Bendick's two Foundational Conclusions are the cornerstone of his entire analysis. Each of his Dependent Conclusions relies directly on them. But as discussed above, neither of Dr. Bendick's Foundational Conclusions is reliable. They are rooted in incomplete and unverified data which Dr. Bendick does not understand and failed to investigate, analyses which cannot be replicated and depart from accepted scientific standards, and assumptions that have no basis in reality. Because these Foundational Conclusions crumble under the slightest scrutiny, the Dependent Conclusions cannot stand. As the saying goes, "garbage in, garbage out."

## IV. CONCLUSION

For the reasons described above, Dr. Bendick's Declaration should be stricken in its entirety as inadmissible.

Dated: July 6, 2018

Respectfully submitted,

By: _/s Blake T. Hannafan_____

Blake T. Hannafan
HANNAFAN & HANNAFAN, LTD.
One East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-0055  phone

James J. Convery
Clifford R. Perry, III
Peter J. Gillespie
LANER MUCHIN, LTD.
515 North State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800  phone
(312) 467-9479  fax

*Attorneys for Defendant Gold Standard Baking, Inc.*

By: _s/ Kenneth W. Gage_____

Kenneth W. Gage
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
kennethgage@paulhastings.com
(212) 318-6046

Alex J. Maturi
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, IL 60606
alexmaturi@paulhastings.com
(312) 499-6076

Elliot Richardson
Michele D. Dougherty
KOREY RICHARDSON LLC
20 S. Clark Street, Suite 500
Chicago, IL 60603
(312) 372-7075

*Attorneys for Defendant Personnel Staffing Group, LLC d/b/a Most Valuable Personnel*