**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAMES ZOLLICOFFER, ANTWOIN HUNT and NORMAN GREEN, on behalf of themselves and similarly situated laborers, | |
| Plaintiffs, | Case No. 13 C 1524 |
| v. | Judge Ellis |
| GOLD STANDARD BAKING, INC., PERSONNEL STAFFING GROUP, LLC d/b/a MOST VALUABLE PERSONNEL d/b/a MVP, | Magistrate Judge Kim |
| Defendants. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO STRIKE THE DECLARATION OF MARC BENDICK, Ph.D.</u>**

Christopher J. Williams
Alvar Ayala
Workers' Law Office, P.C.
53 W. Jackson Blvd, Suite 701
Chicago, IL 60604
(312) 795-9121

Joseph M. Sellers
Shaylyn Cochran
Miriam R. Nemeth
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
East Tower - Suite 500
Washington, D.C. 20005
(202) 408-4600

Counsel for Plaintiffs

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ........................................................................................................... 1

II.     **BACKGROUND** ............................................................................................................ 2

       **A.**    **Dr. Bendick's Assignment and Summary of His Conclusions** ........................ 2

       **B.**    **The Source Data that Defendants Criticize Is a Discovery Dispute among Counsel and, in any case, the Result of MVP's Own Conduct in Discovery** ................................................................................................ 4

            1.    *Lack of Documentation from MVP Showing Pool of Laborers Seeking Work from the Cicero Office Led to Need for Source File of Names and Addresses of MVP Assignees for Expected Representation Analysis* ................................................................ 4

            2.    *Creation of List of 18,191 Laborers Relied on by Dr. Bendick from Two Source Files Produced by Defendant, as Agreed and Approved by Judge Kim* ......................................................... 7

            3.    *MVP Failed To Comply with Court Order to Supplement Discovery in 2016* ........................................................ 8

       **C.**    **Dr. Bendick's Cooperation in Sharing Information with Defendants** ........... 10

       **D.**    **Defendants' Expert, Dr. Amidon, and Her Critique** ................................ 10

III.    **LEGAL STANDARD** ................................................................................................ 12

IV.   **ARGUMENT** ............................................................................................................. 13

       **A.**    **Dr. Bendick's Expected Representation Analysis Is Reliable** ...................... 14

            1.    *The Methodology Utilized by Dr. Bendick for his Expected Analysis is Sound and Dataset Produced by Defendants is Reliable* ....... 14

            2.    *Despite Disagreements with Dr. Amidon, Dr. Bendick Incorporated Data She Insisted Should Have Been Included in Expected Representation Analysis and Found Minimal Impact* ............... 16

            3.    *Similarly, Despite Disagreements with Dr. Amidon, Dr. Bendick Calculated Data She Should Have Been Included in Actual Representation Analysis and Also Found Minimal Impact* ...................... 17

            4.    *Defendants' Critiques of the Source Data Dr. Bendick Used Would "Fall Away" with a Common Database Which Would Help at Trial* ............................................................................ 18

            5.    *The Court Should Not Reward Defendants for their Questionable Conduct in Producing Data Available to Defendants That Should Have Been Produced Four Years Ago* ...................................... 20

            6.    *Dr. Bendick Adequately Supervised and Properly Relied on the Work Performed by Others* ........................................................ 20

            7.    *Dr. Bendick Accounted for Margins of Error* .......................................... 23

            8.    *Miscellaneous Criticisms of Dr. Bendick's Declarations Fail as Well* .............................................................................. 25

V.     **CONCLUSION** ......................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011)................................................. 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)............................. 15, 16, 25

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)............................. 24

*Equal Employment Opportunity Comm'n & Bailey*, 2016 WL 5796890 (N.D. Ill. Sept. 30, 2016) ................................................................................................................................................ 15, 25

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................................... 16

*In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646 (N.D. Ill. 2006)........................................... 24

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 16

*Lapsley v. Xtek, Inc.*, 689 F.3d 802 (7th Cir. 2012) ..................................................................... 16

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) ................................................ 16

*McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30 (D.D.C. 2004) ..................... 25

*Primrose Operating Co. v. National American Ins. Co.,* 382 F.3d 546 (5th Cir.2004)............... 24

*Stephenson v. Honeywell Int'l, Inc.*, 703 F. Supp. 2d 1250 (D. Kan. 2010)................................. 25

*United States v. Parra*, 402 F.3d 752 (7th Cir. 2005)................................................................. 15

*Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.,* No. 08–81211, 2009 WL 5103606 (S.D.Fla. Dec.28, 2009) ........................................................................................................... 25

**<u>Statutes</u>**

Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ............................................................. 4

IDTLSA, 820 ILCS 175/1, et seq. ................................................................................................ 4

**<u>Rules</u>**

Fed. R. Evid. 702 ........................................................................................................................ 15

Fed.R.Evid. 703 .......................................................................................................................... 25

**<u>Treatises</u>**

Statistical Evidence and Expert Testimony, Ann. Manual Complex Lit. § 32.435 (4th ed.) ....... 21

## I.     INTRODUCTION

As a result of Defendant Personnel Staffing Group, LLC d/b/a MVP's failure to maintain and/or produce records related to the identity of individuals who actually sought work assignments at MVP's Cicero branch during the Plaintiffs' proposed Section 1981 Class Period[1] and failure to comply with Illinois law[2] by not recording the race of those assigned to work at its client Gold Standard Baking ("GSB"), Plaintiffs were required to hire an expert to prepare a report on the expected availability of African Americans  in the MVP Cicero office's labor pool ("Expected Representation Analysis") and on the actual representation of African Americans among MVP referrals to GSB ("Actual Representation Analysis") in order to assist the Court in determining the shortfall of assignments of African Americans laborers by MVP to GSB during the class period. Plaintiffs' contracted Dr. Marc Bendick, Jr., Ph.D. to perform such an analysis. Dr. Bendick is a well-qualified expert.  He used reliable, established methodology in conducting his analyses, and his testimony is helpful to resolving the issue of class certification. Defendants do not dispute the qualifications of Dr. Bendick, and his testimony should be admitted.

Notably, in their challenge to Dr. Bendick's report, Defendants primary critique is on the source database Dr. Bendick utilized to perform the analysis. As explained more fully, *infra*, much of Defendants' criticism is the result of their own conduct in discovery and, as once noted by MVP's counsel, is really a discovery issue between counsel. Importantly, Defendants do not dispute Dr. Bendick's qualifications in the field of labor economics, the validity of Dr. Bendick's methodology or that the validity of his conclusions can be adjudicated for the class as a whole. Defendants' own expert even acknowledged that she has the requisite knowledge, technical skills

---

[1] Plaintiffs assert that this is a four year "failure to assign" case with a class period beginning four years prior to the filing of the Complaint, or February 27, 2009 through the end of 2014. Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981

[2] Illinois Day and Temporary Labor Services Act ("IDTLSA"), 820 ILCS 175/12(9).

and access to all of the necessary data to perform her own analysis. Defendants simply did not ask her to perform such an analysis and so she is unable to even identify the impact that her criticisms would have on Dr. Bendick's conclusions. However, at Plaintiffs' request, Dr. Bendick did re-run his own analysis, incorporating – without accepting – each of the data sets Defendants' expert insisted should have been included and which were made available to Plaintiffs. Dr. Bendick determined that the impact of the inclusion of these data sets on his Expected Representation Analysis would be a difference from Dr. Bendick's conclusion of 29.5% to 27.4% and the Dr. Bendick's Actual Representation Analysis for 2009 to 2014 showed an average of 11.7% while Defendants' expert showed an average of 8.1% for 2009 to 2013, in either case a statistically significant shortfall. For purposes of this motion, the question for the Court to resolve is whether the approach proposed by Dr. Bendick is reliable, not whether Dr. Bendick's conclusions ultimately are correct. As set forth below, the answer to this question is in the affirmative. Defendants' Motion to Strike the Declaration of Dr. Bendick ("Motion") should be denied.

## II.    BACKGROUND

### A.    Dr. Bendick's Assignment and Summary of His Conclusions

Dr. Marc Bendick is an experienced labor economist who has an extensive record of publishing in peer reviewed journals, as well as testifying as an expert witness, on numerous topics, including  determining the availability of job-seekers in different demographic groups; processes for recruiting, hiring, training, assigning, evaluating, promoting, compensating, and disciplining employees; policies and practices for managing a demographically-diverse workforce; and economic damages associated with denial or diminution of employment opportunities. *See* Revised Declaration of Marc Bendick, Jr. Ph.D., May 31, 2018 ("Bendick Decl."), at ¶¶1 – 2, attached to Plaintiffs' Reply in Support of their Motion for Class Certification

("Class Cert. Reply") as Exhibit 53. His testimony has been admitted by numerous courts. *Id.*

In this case, Dr. Bendick analyzed the racial/ethnic patterns in the referral of laborers to Gold Standard Baking, Inc. ("GSB") by Personnel Staffing Group, LLC d/b/a MVP ("MVP"). *Id.*, at ¶3. First, based on widely-accepted public data from the U.S. Census Bureau, Dr. Bendick determined that a reasonable, conservative estimate of the expected representation of Non-Hispanic African Americans among MVP laborer referrals to GSB during 2009-2015 is 29.5%. *Id.*, at ¶7(a) and Section III. Second, using data provided by Defendants reporting 11,255 laborers referred to GSB by MVP during 2009-2015, on which the race or ethnicity of these persons were not identified, Dr. Bendick applied the well-established research technique of "geocoding", using data from the U.S. Census, to attribute race and ethnicity to these persons and estimated that the representation of Non-Hispanic African Americans among these referrals was: 1.7% in 2009; 2.8% in 2010; 3.9% in 2011; 5.0% in 2012; 9.9% in 2013; 28.2% in 2014 and 33.9% in 2015. *Id.*, at ¶7(b) and Section IV. Dr. Bendick concluded, *inter alia*, that when the actual referral rates are compared to the 29.5% expected referral rates, there was a "shortfall" in the representation of Non-Hispanic African Americans in the referrals from MVP to GSB from 2009 to 2014 as follows:

| Year | Expected Non-Hispanic Af. Ams. Referrals | | Actual Non-Hispanic Af. Ams. Referrals | | Shortfall in Non-Hispanic Af, Ams. Referrals | |
|------|------|--------|------|--------|------|--------|
| | % | Number | % | Number | % | Number |
| 2009 | 29.5% | 91 | 1.7% | 5 | 17.9% | 86 |
| 2010 | 29.5% | 251 | 2.8% | 23 | 26.8% | 228 |
| 2011 | 29.5% | 391 | 3.9% | 52 | 25.6% | 339 |
| 2012 | 29.5% | 803 | 5.0% | 135 | 24.5% | 668 |
| 2013 | 29.5% | 464 | 9.9% | 156 | 19.6% | 307 |
| 2014 | 29.5% | 781 | 28.2% | 748 | 1.3% | 34 |
| 2015 | 29.5% | 539 | 33.9% | 618 | None | |

| TOTAL 2009-2014 | 29.5% | 2,782 | 11.9% | 1,120 | 17.6% | 1,662 |
|---|---|---|---|---|---|---|

*Id.*, at 7(c), Section V and Table D-1.

One of Defendants' primary critiques of Dr. Bendick's Declaration is that he relied on flawed source data to conduct his Expected Representation and Actual Representation Analyses and thus his conclusions are unreliable. Motion, at 1, 12-14, and 22 – 24. Given how integral this argument is to Defendants' Motion, some background on the origin of this source data is warranted.

**B.     The Source Data that Defendants Criticize Is a Discovery Dispute among Counsel and, in any case, the Result of MVP's Own Conduct in Discovery**

Defendants repeatedly criticize Dr. Bendick for his reliance on a source data file of 18,191 addresses he utilized in performing his Expected Representation Analysis which resulted in an expected representation of non-Hispanic African American's in MVP's labor pool of 29.5%. *Id.* Plaintiffs continue to believe the universe of addresses that Dr. Bendick analyzed is the correct one for this lawsuit; Defendants' objection to the data Dr. Bendick analyzed, perhaps conveniently so, is a problem of MVP's own making.

*1.    Lack of Documentation from MVP Showing Pool of Laborers Seeking Work from the Cicero Office Led to Need for Source File of Names and Addresses of MVP Assignees for Expected Representation Analysis*

In discovery, Plaintiffs sought records from MVP that would show which laborers actually appeared at the MVP Cicero office seeking work, specifically requesting, among other records, "sign-in sheets" that were used at the branch office each day and on which laborers who were present would indicate their name and phone number. *See* Declaration of Christopher J. Williams ("Williams Decl."), at ¶6, attached hereto as Exhibit A. Sign-in sheets, by way of example, would provide a means of identifying all of the individuals who sought work at the

MVP Cicero office during the class period as well as indicating other information such as, the order in which each person arrived. [3] Defendant MVP denied, under oath, use of sign-in sheets since March 2013 (the period after Plaintiffs' filed this lawsuit) and stated that it had no sign-in sheets from prior to March 2013 in its possession or control. *Id.*, at ¶¶6-7. MVP's formal denial came despite overwhelming evidence that sign-in sheets were in fact in common use in the MVP Cicero office during the class period, even from MVP's own corporate witness. *Id.*, at ¶8. Multiple other witnesses testified that sign-in sheets continued to be used at the MVP Cicero office well past March 2103. *Id.*, at ¶8.

As a result of MVP's denial of the use of, failure to maintain and/or refusal to turn over sign-in sheets, Plaintiffs determined it was necessary to find another means to establish the *expected* representation of African Americans who sought work from MVP's Cicero office as records that would have shown the *actual* representation of African Americans were not produced by MVP. *Id.*, at ¶9. Plaintiffs' counsel consulted with an expert, Dr. Bendick, who advised that an analysis of racial patterns in MVP's referral to GSB could be conducted by using the addresses for all laborers assigned out of the Cicero Office during the relevant time period to determine the Office's reasonable recruitment area and, after further determining the expected representation of non-Hispanic African Americans for that recruitment area. *Id.*, at ¶10.

As a first step to determining the expected representation of African Americans seeking work assignments from the MVP Cicero office during the Section 1981 Class Period, Dr. Bendick advised that he would require the names and addresses of all laborers who received an assignment from the MVP Cicero office during the Section 1981 Class Period to establish the geographic area from which the MVP Cicero office drew laborers. *Id.*, at ¶11. On June 16, 2014,

---

[3] *See* Sanchez III Dep. at 16:9-17, Ex. 22; Class Cert. Mem., at 27-30 (describing the Named Plaintiffs' experience with sign-in sheets).

Plaintiffs sought leave of Court to propound additional written discovery seeking the information Dr. Bendick required for his analysis, including the name and address of each person who was assigned through MVP to work at a client company of MVP during the class period. *Id.*, at ¶12. Initially Defendant refused to produce such information, claiming that its "database only allows MVP to provide the report [of names and addresses] for all employees in the Cicero office, and MVP cannot limit those employees by time (i.e., whether or not the employee was assigned during the Section 1981 statute of limitations period)." *Id.*, at ¶13. As discussed below, this representation was not accurate. Judge Kim granted Plaintiffs' request for the name and address information and set a hearing for August 21, 2018 to consider MVP's claims of burdensomeness and inability to produce the requested list of laborers. *Id.*, at ¶¶14-17. Prior to the hearing, Plaintiffs' counsel entered into an agreement with MVP to resolve this discovery dispute based on MVP's professed inability to produce the requested list with addresses limited to the class period. *Id.*, at ¶¶19-20. As described on the record by MVP's counsel, MVP agreed to "give [Plaintiffs' counsel] the names and the addresses of the entire universe of people who were entered into the MVP system over 14 years…from the Cicero office" along with the list of all assignees out of the MVP Cicero office to allow Plaintiffs' counsel to cull from the larger list those who had been assigned out of MVP's Cicero office during the class period. *Id.*, at ¶20 and Attachment 3, Kim 8/21/14 Transc., at 15:24-20:10. On August 21, Judge Kim issued an order approving and memorializing the parties' agreement which stated, in pertinent part:

> With respect to this court's orders dated June 19 and July 30, 2014, pertaining to Plaintiffs' interrogatory ##9 and 16, and request for production of documents #8, the stay is lifted *and MVP is ordered to provide the two Excel lists identified and stipulated to by Plaintiffs in open court by September 12, 2014.*
> Dkt. No. 221. (emphasis added)

*Id.*, at ¶21. Part of the stipulation reached by the parties, at MVP's insistence, was that Plaintiffs' counsel was required to return or destroy all copies of the Excel source files. *Id.*, at ¶20.[4]

### 2. Creation of List of 18,191 Laborers Relied on by Dr. Bendick from Two Source Files Produced by Defendant, as Agreed and Approved by Judge Kim

Pursuant to an agreement reached by the parties and approved by Judge Kim, on September 12, 2014, MVP produced two lists to Plaintiffs: (1) a csv file with the names of all assignees from the MVP Cicero Office since the Cicero Office had opened in approximately 2000, along with the MVP ID and address information for each laborer, including an "Address" field and "Alternate Address" field[5] ("Master Address List"); and (2) a csv file showing individuals who had received payment (and thus had been assigned) by MVP from its Cicero Office during the Section 1981 Class Period, along with MVP ID numbers ("Class Period Assignment List"). *Id.*, at ¶22. As agreed by the parties and approved by Judge Kim, Plaintiffs' counsel Christopher J. Williams oversaw the merging of the two lists and culled from the Master Address List all individuals who did not appear on the Class Period Assignment List. The remaining records were the basis for the list of 18,191 individuals with all of the address and alternate address information as provided by MVP. *Id.*, at ¶23. As described in detail in Mr. Williams' declaration, the two files produced by MVP were merged and a list of 18,191 individuals who had been assigned out of MVP's Cicero office during the putative class period was produced with an address and alternate address field for each. *Id.*, at ¶¶23-25. On October 7,

---

[4] As discussed, *infra*, this is significant because there is now a dispute over the actual source file that MVP produced. Plaintiffs' counsel asserts that Defendants have represented that it produced a different list as a source file in a different format than that actually produced. *Id.*, at Exh. 9 (Williams July 10, 2018 correspondence to Kenneth Gage).

[5] Whether this list produced by MVP contained an "Address" field and "Alternate Address" field is now disputed by the parties as described in footnote 4, *supra*.

2014, Plaintiffs' counsel provided this List of 18,191 MVP Assignees to MVP's counsel in Excel

format via email and wrote:

> As you know, I was out of the office yesterday and [Plaintiffs' counsel] Peter sent the below list of individuals identified in our Motion For Leave to Contact Putative Class Members who are believed to be African American. Attached is the larger list from which these names were drawn, the list of all laborers assigned from MVP's Cicero Office from the period of 11/2009 – present. This list was created by merging the data provided by MVP in two Excel files on September 12, 2014 entitled:
>
> 1) 14-0912 MVP Employees Paid 11-1-09 to Present.csv; and
> 2) 14-0912 All MVP Cicero Employees – Confidential – Attorneys Eyes Only.csv.
>
> *Please review the attached list entitled "14_0930 All MVP Cicero EEs w GSB Assignees 2009-2013" to confirm that this is the list of individuals assigned from MVP's Cicero office from 11/1/2009 through the date of the list's production.*

*Id.*, at ¶26 and Attachment. Since the October 27, 2014 email to the filing of Defendants' Motion

to Strike Dr. Bendick's Declaration, Defendants have refused engage in a discussion about

whether the accuracy and completeness of the data drawn from these manual compilations which

could have constituted a common database to govern both sides' analyses; nor have Defendants

objected to the this database despite its repeated use in this litigation. *Id.*, at ¶¶27-29.  Therefore,

Plaintiffs' counsel provided the List of 18,191 MVP Assignees to Dr. Bendick as the list of

laborers assigned from MVP Cicero office during the Section 1981 Class Period produced by

Defendants and on which he could rely. *Id.*, at ¶27.

### 3.  *MVP Failed To Comply with Court Order to Supplement Discovery in 2016*

Notwithstanding Defendants' now late objection to the use of the List of 18,191 MVP

Assignees by Plaintiffs' expert, Defendants had an opportunity to preemptively moot out the

dispute entirely. On October 26, 2016, after the parties advised the Court that settlement efforts

had failed, Judge Kim ordered the parties to update their Rule 26(a)(1) disclosures and

supplement their discovery responses pursuant to Rule 26(e). *Id.*, at ¶30. MVP did not

supplement the record of individuals assigned out of its Cicero office during the Section 1981 Class Period despite its obligation to do so pursuant to Judge Kim's October 26, 2018 and despite Plaintiffs' repeated efforts to the obtain from MVP updated electronic lists of names and addresses of laborers assigned out of the MVP Cicero office, including in a letter from Plaintiffs' counsel to MVP's counsel sent on December 12, 2016. *Id.*, at ¶31 and Attachment 5. Therefore, in the fall of 2014, in the absence of new information from Defendants or any prior objection to the data set of the List of 18,191 MVP Assignees from Defendants and Dr. Bendick's assurance that the Expected Availability Analysis he had provided in 2014 would continue to be reliable for purposes of Plaintiffs' Class Certification Motion because updates to the Census Bureau data upon which Dr. Bendick relied differ only slightly from year to year "because in large part because the analyses are based the same data for four of the five years covered in each data set and also because residential turnover is typically relatively slow", Plaintiffs' counsel instructed Dr. Bendick to rely on his 2014 Expected Availability Analysis for purposes of Plaintiffs' Motion for Class Certification. *Id.*, at ¶34 and fn. 6. In his declaration, Dr. Bendick noted this and stated "If appropriate, I can prepare an 'updated' analysis for trial, although I expect that it too will show little if any difference from the figures in the present report." *Id.*; *see*, also, Exh. 53 to Class Cert. Reply, fn. 4.

MVP did not supplement the list of all laborers assigned from its MVP Cicero Office by year for the period of 2009 through 2015 until *November 14, 2017*, a full year after MVP had been ordered to do so by Judge Kim and eleven months after Plaintiffs' requests. Williams Decl., at ¶¶31-32. In making this late production, MVP produced the list in exactly the format that Plaintiffs had requested and MVP had misrepresented to the Judge Kim that MVP could not in its *July 2, 2014 pleadings* and at the *August 21, 2018 hearing* with names and addresses of

assignees from the MVP Cicero office during the class period using the identical TempsPlus database. *Id.*, at ¶32.

### C.     Dr. Bendick's Cooperation in Sharing Information with Defendants

With the filing of Dr. Bendick's Declaration in support of Plaintiffs' Motion for Class Certification on March 28, 2018, Dr. Bendick identified all of the documents on which he had relied in preparing his Declaration, even emailing the Excel spreadsheets referenced in his report.[6] Further, in response to a subpoena from Defendants, Dr. Bendick provided 24 electronic files containing multiple documents and 15 different Excel files.[7] Defendants' claim that Dr. Bendick withheld the List of 18,191 MVP Assignees referenced in paragraph 12 of his declaration is disingenuous, at best. As described in great detail in Section II.B.2., *supra.*, Defendants have been in possession of this data file since October 7, 2014.

Defendants attempt to make much of the fact that Dr. Bendick subsequently submitted a revised draft of his Declaration in this case. The changes Dr. Bendick made are clearly spelled out in paragraph 0 of his Revised Declaration.[8] The revisions are relatively minor numerical or typographical corrections and Defendants had the Revised Declaration well in advance of Dr. Bendick's deposition.

### D.     Defendants' Expert, Dr. Amidon, and Her Critique

In contrast to Dr. Bendick's extensive experience in conducting scholarly research and "blind-refereeing" such research in peer-reviewed scholarly journals; developing affirmative action plans for employers; training graduate students and early-career professionals; and

---

[6] *See* Bendick Decl., fn. 1.

[7] Dr. Bendick did neglect to share one SAS file with Defendants that came out during his deposition, but that was an oversight and the file was emailed and provided to Defendants that day.

[8] *See* Exh. 53 to Plaintiffs' Reply, at ¶0; see, also, Deposition of Dr. Bendick, 9:20-10:16, Dkt. No. 601-8.

providing research-based advice to public policy makers such as the on advisory panels of the National Academy of Sciences,[9] Dr. Amidon has almost no experience in these areas and certainly none as the lead researcher. Where Dr. Bendick's assignment for this case was to affirmatively determine the shortfall of non-Hispanic African Americans referred from MVP to GSB during the Section 1981 Class Period, it appears that Dr. Amidon's assignment was to do little more than take shots at Dr. Bendick's work without doing any affirmative analysis of the data herself. Dr. Amidon repeatedly admitted that, while she had the requisite skills and training to conduct these same analyses and had access to the necessary data from her client, MVP, to do so and could have done so, Defendants simply did not ask her to do so and she did not.[10] As a result, Dr. Amidon admitted that she could not say "*one way or the other*" what, if any, impact incorporating the data she believed Dr. Bendick should have included would have on the analysis.[11] Rather than offer an alternative analysis that would assist the Court in determining if there is any material difference, Defendants satisfied themselves with asking their expert to merely offer criticisms based on mere speculation.[12]

Further, much of the basis of Dr. Amidon critique of Dr. Bendick's Declaration is that he relied too heavily on Plaintiffs' counsel for the source data, even though she seemed to have no idea about the genesis of the source file Dr. Bendick used and which is described in detail,

---

[9] *Id.*, at 1-2, Exhs. A and B.

[10] Deposition of Dr. Carrol Amidon ("Amidon Dep."), at 116:7-19, attached hereto as Attachment 6 to Exhibit A (Williams Decl.).

[11] *Id.*

[12] For example, in her deposition, Dr. Amidon admitted that she did not know whether the additional addresses she claimed should have been included in Dr. Bendick's analysis come from records within the class period; she did not supervise or otherwise investigate the creation of the dataset that Defendants claim was the original source file; she relied completely Defendants' counsel's representation about the origin of the files and how the files were created. *Id.,* at 47:14-48:10, 83:2-85:14. In short, Dr. Amidon did not even follow her own advice.

*supra*.[13] Dr. Amidon seemed to be unaware, for example, that the source data file used by Dr. Bendick came from a Court-supervised resolution of a motion to compel MVP to produce the data. Dr. Amidon even admitted that she, herself, had to rely on Defendants' counsel's representation as to the authenticity of the data provided to her and acknowledged that it was reasonable for an expert to rely on an attorneys' representation about the accuracy of data, as she had done.[14] Stunningly, Dr. Amidon even admitted that the first draft of her declaration "came from [Defendant's] attorneys."[15]

## III.    LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's seminal case, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Equal Employment Opportunity Comm'n & Bailey*, No. 10 C 6139, 2016 WL 5796890, at *1 (N.D. Ill. Sept. 30, 2016)(citing *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). By its terms, Rule 702 allows the admission of testimony by an expert, someone with the requisite "knowledge, skill, experience, training, or education[,]" to help the trier of fact "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Experts are permitted to testify when their testimony is: (1) "based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.*

*Daubert* requires the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to

---

[13] *Id.*, at 46:7-48:10.

[14] *Id.*

[15] *Id.*, at 24:7-19.

hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) ("[W]e 'give the district court wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Dr. Bendick possesses the requisite knowledge, skill, experience, training, and education to help the trier of fact understand the evidence and to determine issues of fact in this case. His opinion is based upon sufficient facts and data; his testimony is the product of reliable principles and methods; and he has reliably applied the principles and methods to the facts here. Plaintiffs have met the *Daubert* preponderance standard and the trier of fact should be permitted to consider Dr. Bendick's expert opinion at trial.

**IV.    ARGUMENT**

Defendants' criticisms of Dr. Bendick's Declaration go to the weight given to his analysis, not the admissibility. Notably, Defendants do not criticize the use of Expected Representation and Actual Representation Analyses and do not suggest that these analyses will not assist the trier of fact to determine whether there was a significant shortfall of non-Hispanic African Americans in the referrals from MVP to GSB during the class period. In fact,

Defendants' own expert, Dr. Amidon, acknowledged that she could have done an affirmative analysis to compare with that of Dr. Bendick, but she was never asked to do so.[16]

### A.    Dr. Bendick's Expected Representation Analysis Is Reliable

#### 1.    *The Methodology Utilized by Dr. Bendick for his Expected Analysis is Sound and Dataset Produced by Defendants is Reliable*

Back in 2014, in response to an order compelling the production of the names and addresses of all laborers assigned from the MVP Cicero office during the Section 1981 Class period, Defendants produced what they represented was the list of all Cicero office assignees along with an address and an alternate address as well as a list of laborers who had received a paycheck during the class period.[17]  Dr. Bendick estimated a 29.5% expected representation of non-Hispanic African Americans based on his analysis of 18,191 workers' home addresses.[18]

Dr. Amidon criticizes Dr. Bendick for not including three sets of address data she claims were improperly excluded by Dr. Bendick or Plaintiffs' counsel. Dr. Amidon argues that this analysis should also have included: (1) 3,552 "alternative addresses from that file of 18,191 workers; (2) 4,862 "third addresses" from 5,107 other workers she believes were incorrectly omitted; and (3) 869 addresses from distant parts of the Chicago Metropolitan Area.[19]  In his rebuttal Declaration, Dr. Bendick responds that based on his extensive professional experience, none of Dr. Amidon's criticisms is consistent with standard professional practices of economists and other employment analysts, and inclusion of these additional addresses would tend to decrease, rather than increase, the accuracy and reliability of the estimate.[20]  For example, where

---

[16] *Id.,* at 116:7-19.

[17] Williams Decl., ¶23.

[18] *See* August 20, 2018 Rebuttal Declaration of Marc Bendick, Jr., Ph.D. ("Bendick Rebuttal Decl."), at 2(a), attached to Plaintiffs' Reply as Exhibit 55.

[19] *Id.,* at ¶¶2(a) and 5-15.

[20] *Id.,* at ¶¶2(a) and 6.

Dr. Amidon insisted Dr. Bendick should have included multiple addresses for a single person, even addresses in use outside of the class period,[21] Dr. Bendick warns that the standard professional practice among economists and other employment analysts is to examine only the first address listed, otherwise using an alternate address for the same individuals would give such twice the weight in the estimate to the 19.5% of the workers who happen to have two addresses listed.[22] Further, Dr. Bendick warns that including the 4,862 "third addresses" would further compound the concern above and, given that Dr. Amidon could not rule out that these addresses were from years prior to the class period, would tend to further reduce, rather than increase the reliability of the estimates and standard professional practice among economists and other employment analysts would be to exclude these "third addresses."[23]

Finally, in response to Dr. Amidon's critique that Dr. Bendick improperly excluded 869 addresses in 30 Additional PUMAs[24] in the Chicago metropolitan area, Dr. Bendick states that, in estimating the expected representation of a demographic group, the standard professional practice is to begin by determining a "reasonable recruitment area."[25] When, as in the present case, the reasonable recruitment area is established from workers' home addresses, it is not the standard practice to encompass the address of every single worker available for analysis but as defined by the of federal regulations governing development of federal contractors' affirmative action plans:[26]

The reasonable recruitment area is defined as the geographical area from which

---

[21] *See id.*, ¶12, fn. 14.

[22] *Id.*, at ¶¶7-8.

[23] *Id.*, at ¶¶9-11.

[24] A PUMA is a Public Use Microdata Area containing an average of about 100,000 residents.

[25] Bendick Rebuttal Decl., at ¶12.

[26] *Id.*, at ¶12, fn. 15.

the contractor *usually seeks or reasonably could seek* workers to fill the position in question.

As a result, in rebuttal, Dr. Bendick still concludes that the most accurate and reliable estimate remains of the expected availability of non-Hispanic African Americans in the MVP Cicero office's labor pool is 29.5%.

> 2. *Despite Disagreements with Dr. Amidon, Dr. Bendick Incorporated Data She Insisted Should Have Been Included in Expected Representation Analysis and Found Minimal Impact*

Despite Dr. Bendick's disagreements with Dr. Amidon's suggestions about the data that should have been included in his Expected Representation Analysis, he did what Defendants refused to do[27], measured the impact of including the contested addresses discusses in Section IV.1., *supra*. Dr. Bendick re-did his analysis using 27,464 addresses, combining the original 18,191 addresses with the three sets of additional addresses Dr. Amidon advocates.[28] To implement Dr. Amidon's suggestions, Dr. Bendick computed the African American representation in each of the three sets of addresses Dr. Amidon suggested adding.[29] Dr. Bendick found the resulting expected representation to be 27.4%, a number 93% as large as the 29.5% he had found.[30] Thus, even adopting Dr. Amidon's suggested modifications would change the 29.5% estimate only modestly.[31]

---

[27] Amidon Dep., at 62:9-63:5; 78:4-12; 89:16-22; 115:14-116:19 (Defendants' expert repeatedly acknowledging she did not do an affirmative analysis including the data she believed should have been including in Dr. Bendick's report and did not know "one way or the other" what, if any impact, inclusion of the data would have on the analyses).

[28] Bendick Rebuttal Decl., at ¶2(b).

[29] *Id.*, 18.

[30] *Id.*

[31] *Id.*; note also that, despite repeated efforts to have Dr. Amidon or Defendants' counsel produce the list of 390 unique individuals Dr. Amidon claimed were improperly excluded, and of the 3,498 alternate addresses she claimed were on the List of 18,191 MVP Assignees and were improperly excluded, Defendants refused to produce these lists. Williams Decl., ¶¶35-39, fn. 7. Defendants' counsel insisted Plaintiffs' counsel had adequate information to produce the list, but Dr. Amidon's count of

### 3. Similarly, Despite Disagreements with Dr. Amidon, Dr. Bendick Calculated Data She Should Have Been Included in Actual Representation Analysis and Also Found Minimal Impact

Similarly, Dr. Amidon criticized Dr. Bendick's computation of the actual representation of non-Hispanic African Americans among MVP referrals to GSB. For example, she reports a representation in 2009 of 3.9% rather than the 1.7% reported in the *Revised Bendick Declaration*.[32] Despite disagreements with several of Dr. Amidon's critiques,[33] Dr. Bendick incorporated them into his analysis for purposes of evaluating the impact of those changes on his conclusions. The result is a modestly higher Actual Representation calculated by Dr. Amidon compared to those reported in the *Revised Bendick Declaration*:

---

alternate addresses from the List of 18,191 MVP Assignees of is 3,498, while using the "filter" process in Excel she describes yields a count of 3,552. This just highlights the problem with not having a common database. However, as the addition 27,464 addresses modified the Expected Representation Analysis by about 2%, adding these additional 4,000 addresses would be likely to have a significant impact and may even increase the percentage. However, bluntly, there was no legitimate reason for Defendants not to produce these lists, especially given Dr. Amidon's testimony she could create the lists of 390 and 3,498.

[32] Amidon Decl., ¶¶40-41.

[33] For example, Dr. Amidon argues that in the calculations of the actual representation of non-Hispanic African Americans among MVP referrals to GSB, Dr. Bendick should have used the "AVERAGE" function in my EXCEL data spreadsheets rather than the "AVERAGEA" function (the difference is that the former treats "blank" data entries as observations to be included in the analysis with a value of zero, while the latter excludes these observations), excluding blank entries. *Id.* However, to the extent that addresses are missing at a higher rate for non-Hispanic African Americans because of racially-related MVP policies or practices, then excluding the blank observations, as Dr. Amidon recommends, would incorrectly over-estimates the representation of non-Hispanic African Americans as, representation of non-Hispanic African Americans among referrals to GSB. This issue can be resolved prior to a trial on the merits in this case. Bendick Rebuttal Decl., ¶¶21-23.

| Year | Bendick Calculation | Amidon Calculation |
|------|--------------------|--------------------|
| 2009 | 1.7% | 3.9% |
| 2010 | 2.8% | 5.3% |
| 2011 | 3.9% | 6.4% |
| 2012 | 5.0% | 7.4% |
| 2013 | 9.9% | 13.2% |
| 2014 | 28.2% | 34.6% |
| 2015 | 33.9% | 39.0% |
| Average 2009-2013 | 4.7% | 7.2% |

*Id*., at 22. As the chart above shows, even with the changes proposed by Dr. Amidon in the Actual Representation Analysis and that of the Expected Representation Analysis discussed in Section IV.A.2., *supra*, there remains a statistically significant shortfall for 2009 – 2013.[34]

        *4. Defendants' Critiques of the Source Data Dr. Bendick Used Would "Fall Away" with a Common Database Which Would Help at Trial*

Even Defendants' expert concedes that her primary criticisms of Dr. Bendick—the purported unreliability of the data—would disappear if the parties were to agree on a common database to govern the parties' analysis at trial.[35] As early as 2014, Plaintiffs sought MVP's agreement, which it withheld, on just such a common database from which both sides' experts could opine.[36] As MVP's counsel stated at one point during the deposition of Dr. Amidon when

---

[34] Dr. Bendick's analysis shows a shortfall for 2014 as well. *See* Dr. Bendick's table at Section II.A., *supra*.

[35] Amidon Dep. at 67:7-69:5, Attachment 6 to Exh. A.

[36] *See* Williams Decl., 25-29. In advance of trial, of course, Plaintiffs will renew their proposal to agree on a common database from which the parties may conduct their analyses, in the hope of avoiding these distracting and needless disputes. *See* 32.435. Statistical Evidence and Expert Testimony, Ann. Manual Complex Lit. § 32.435 (4th ed.) ("Consider encouraging the parties to agree on joint development of a common database on which their respective experts will conduct their studies. If they cannot agree on

discussing the source data: "…so really what you're talking about is a discovery issue between counsel."[37] Plaintiffs agree. Far from being a disqualifying attack on Dr. Bendick, the critiques leveled by Defendants related to the source files used by Dr. Bendick are really a discovery dispute that clearly must be litigated by counsel, not the parties' experts.

On cross examination by MVP's counsel, Dr. Amidon's took the position the data currently available in this case are inadequate to support an appropriate analysis of class certification issues, a position is not consistent with standard professional practices of economists and other employment analysts.[38] The degree of incompleteness, ambiguity, and other limitations of these MVP records is within the normal range for typical employer records.[39] They are within the range of data quality, completeness, and documentation of data on which economists and other employment analysts routinely rely in estimating expected representation, actual representation, and the difference ("shortfall") between the two.[39] Such analyses of less than perfect employer records are commonly considered reliable, acceptable, and useful in providing research-based advice to public policy-makers (e.g., through advisory panels of the National Science Foundation or in research-based Congressional testimony).[40] Equally, they are routinely considered reliable, acceptable, and useful in providing consulting or management assistance to employers (e.g., in conducting wage equity analyses or developing employers' affirmative action plans).[40]

---

a common database, the court should direct them to use pretrial verification procedures to eliminate (or quantify) errors in the different databases.").

[37] Amidon Dep., at 64:18-20, Attachment 6 to Exh. A.

[38] Bendick Rebuttal Decl., ¶44 and fn. 27.

[39] *Id.*, at ¶45.

[40] *Id.*, at ¶46.

While Dr. Amidon and Dr. Bendick disagree on a number of points, they do appear to agree on one thing: that the simplification and clarity of creating an agreed-upon database for trial would help the trier of fact.[41]

### 5. The Court Should Not Reward Defendants for their Questionable Conduct in Producing Data Available to Defendants That Should Have Been Produced Four Years Ago

In any case, Defendants should not benefit from MVP's actions in withholding, for four years, name and address records of laborers assigned out of the MVP Cicero office during the Section 1981 Class Period that Judge Kim had ordered MVP to produce.[42] But for MVP's representation that it was not possible to produce the records in the form sought by Plaintiffs, now known not to be accurate, the records that were produced on November 14, 2017 would have been available to Plaintiffs' and their expert long ago. Further, had Defendants been more forthcoming about the records available, raised any concerns they may have had about the dataset that Defendants knew Dr. Bendick had relied on for years to conduct an Expected Availability Analysis, and meaningfully engaged in a discussion about an agreed upon dataset, much of this litigation sparring would have been rendered unnecessary.

### 6. Dr. Bendick Adequately Supervised and Properly Relied on the Work Performed by Others

Defendants contend that Dr. Bendick relied upon work performed by others without adequately supervising that work. Mem. at 5-7, 15. Yet Dr. Bendick's reliance upon assistants and third parties to provide data and calculations was proper, and any challenge to the underlying facts and data upon which Dr. Bendick relied goes only to the weight of his analysis, not its admissibility.

---

[41] *Id.*, at ¶45 and fn. 28.

[42] *See* Williams Decl., 12-21, 32.

Generally, an expert witness may rely on facts or data not based on personal perception if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Defendants do not argue that the data files MVP itself produced in discovery, or the use of SQL computer code and SAS computer code to address that data, is not reliable. Instead, Defendants argue that Dr. Bendick needed some sort of heightened level of supervision over the work performed by others in order for his expert declaration to be admissible, or that the individuals who assisted Dr. Bendick should have themselves been disclosed as experts. Mem. at 6-7. However, "[a]n expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir. 2002); *see,* also, *Primrose Operating Co. v. National American Ins. Co.,* 382 F.3d 546, 562 (5th Cir.2004) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.")

Defendants' reliance on *Dura* is misguided. *See* Mem. at 15. There, the Seventh Circuit held that an expert hydrogeologist could not testify as to the reliability of groundwater-flow models used by other experts. *Id.* at 612. Judge Posner found that the experts who constructed and performed the groundwater modeling "did not merely collect data for [the hydrogeologist] to massage or apply concededly appropriate techniques in a concededly appropriate manner, or otherwise perform routine procedures," *id.* at 615, but applied a "host of discretionary expert judgments" that were critically relevant to the central contested issues in the case. Thus, the hydrogeologist had improperly become the "mouthpiece" of experts in another specialty. *Id.* at 614. Here, however, Dr. Bendick simply relied upon others to gather and process the data upon

which his opinion relied, and the work of others contained no discretionary or expert judgments at all. These are precisely the type of "data gatherers" an expert may rely upon and need not present as testifying witnesses. *Id.* at 613. *See also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 658-59 (N.D. Ill. 2006) (expert may rely on data provided by individual hired by plaintiffs' counsel, "especially since the data employed was taken not from the plaintiffs, but from documents from the defendants' own files."); *Equal Employment Opportunity Comm'n & Bailey*, No. 10 C 6139, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016) (expert's reliance on geocoding work performed by third party was a "routine procedure" that did "not raise the concerns voiced by the court in *Dura*"). And, as Defendants recognize, while Dr. Bendick relied upon his assistants' proficiencies in the computer systems needed for his analysis, Dr. Bendick nonetheless provided guidance and direction to these individuals regarding the analysis that he would perform. Mem. at 6-7. *See also Stephenson v. Honeywell Int'l, Inc.*, 703 F. Supp. 2d 1250, 1255 (D. Kan. 2010) (expert properly "relied on something prepared by another at [expert]'s direction; there is no rule prohibiting an expert's use of assistants if the ultimate opinions are those of the expert and he is qualified to give those opinions"); *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 08–81211, 2009 WL 5103606, at *2 (S.D.Fla. Dec.28, 2009) ("Courts routinely permit experts to rely upon assistants to carry analyses that the expert designed."); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36 (D.D.C. 2004) (expert "need not personally be an expert in STATA [computer programming] in order to be a qualified expert under *Daubert*. Rather, pursuant to Fed.R.Evid. 703, an expert may rely on any facts or data "of a type reasonably relied upon by experts in the particular field," including facts, data, and opinions that are otherwise inadmissible. This includes relying on one's assistants to carry out analyses that the expert designed.").

Thus, Dr. Bendick properly relied upon other individuals in performing his expert work, provided sufficient guidance to these individuals, and these individuals need not have been disclosed as experts.

### 7. Dr. Bendick Accounted for Margins of Error

In her Declaration, Dr. Amidon quotes the *Reference Manual on Scientific Evidence* which states:

> [A]n expert testifying about any survey should provide enough information to allow the judge to evaluate how potential error, including coverage, measurement, non-response, and sampling error, may have affected the obtained pattern of response.

While Dr. Bendick agrees that this is a well-respected, frequently-cited professional work developed by the Federal Judicial Center and the National Academy of Sciences to guide federal judges in assessing findings such as those reported in Dr. Bendick's Declaration. However, Dr. Amidon's suggestion that Dr. Bendick's Declaration does not conform to this standard is incorrect.[43] It is appropriate to provide the trier of fact with information about the range of uncertainty around a statistical estimate on which an expert is advising a court to rely. Statistical analysts sometimes report this information in terms of a "margin of error" such as the "95% confidence interval" to which Dr. Amidon refers. In judicial proceedings, it is more commonly reported in terms of a "level of statistical significance," usually expressed either in terms of the number of "standard deviations," or in terms of a probability that an estimated figure could be different from zero due to chance alone, or both.[44] Section IV of the *Revised Bendick Declaration,* titled "Statistical Significance of this Shortfall," reports the range of uncertainty surrounding Dr. Bendick's estimate of the central statistical finding in the analysis -- the shortfall between expected and actual representation of non-Hispanic African Americans in referrals by

---

[43] Bendick Decl., ¶34.

[44] *Id.*, at 35.

MVP to GSB.[45] It states this information both in terms of "standard deviations" and "probabilities."[46] It provides exactly the information called for in the passage quoted in paragraph 34 above -- in Dr. Amidon's own words, "so that the reader may know with what level of confidence the estimates can be viewed."[47]

Dr. Amidon suggestion that Dr. Bendick should have reported separate "margins of error" for each of the 18 PUMAs included in the MVP Chicago reasonable recruitment area.[48] However, the information in Dr. Amidon's Table 3 is unlikely to be useful to a trier of fact in understanding and assessing the statistical findings in the present case so it would not be standard professional practice among economists and other employment analysts to report such information.[49] No estimate in the Dr. Bendick's Declaration is based on data from individual PUMAs but only on all 18 PUMAs in the reasonable recruitment area *taken together*.[49] The margin of error associated with any individual PUMA is essentially irrelevant.[49] To supplement the findings concerning statistical significance presented in Bendick's Decl.*,* the one piece of "margin of error" information that the trier of fact might find informative is that for the 29.5% estimate of expected representation is based on all 18 PUMAs together.[49] Dr. Amidon does not report this figure, but in Table R-3 of Dr. Bendick's Declaration, he has built on Dr. Amidon's Table 3 to approximately do so, with a resulting margin of error of 3.63% or an upper bound of 33.1% and a lower bound of 25.9%.[50]

---

[45] *Id.*, at 36.

[46] *Id.*

[47] *Id.*

[48] *See* Amidon Decl., Table 3.

[49] *See* Bendick Decl., ¶38.

[50] *Id.*, at 39-40.

8.  *Miscellaneous Criticisms of Dr. Bendick's Declarations Fail as Well*

Defendants' remaining criticisms of Dr. Bendick also do not render his analysis unreliable.  In fact, these issues are so minor that even if true, they would not disturb Dr. Bendick's core opinions in this case.  Nevertheless, these criticisms, just like the others Defendants' advance, are unavailing.

First, Defendants remarkably fault Dr. Bendick because their expert reported that she was unable to replicate some of Dr. Bendick's individual computations.[51]  Mot. at 15-16. However, the issues for which Dr. Amidon could not replicate Dr. Bendick's computations are inconsequential. Dr. Amidon reported differences between her computations and Dr. Bendick's computations for the number of non-Hispanic African Americans residing in individual PUMAs. For example, in PUMA 03408, she reported a figure of 1,667 non-Hispanic African Americans while Dr. Bendick reported 1,606.  Bendick Rebuttal Report at Attachment A. While the most likely explanation for the computational difference is that Dr. Amidon failed to implement the precise criteria Dr. Bendick and his assistant utilized during their computation, the important takeaway is that the effect of this difference is minimal, at best.  Using his figure of 1,606, Dr. Bendick computed the proportion of non-Hispanic African Americans in this PUMA to be 8.7%; in critiquing Dr. Bendick's analysis and using her figure of 1,6667, Dr. Amidon found the proportion of non-Hispanic African Americans in this PUMA to be a comparable 9.0%.  *Id.*

Second, Defendants assert that Dr. Bendick should have investigated the reasons for the missing addresses of some laborers, asserting that a review of MVP's untimely supplemental data production in 2017 could have addressed some of the missing addresses.  Mot. at 23-24. Here again, this problem is one of Defendants' own making, as this data issue could have been

---

[51] As set forth above, and contrary to Defendants' assertions, Dr. Bendick supervised and directed the work of Mr. Glimpse on these computations.

resolved years ago if MVP had produced the laborer addresses in the manner requested, engaged Plaintiffs on a discussion to ensure the accuracy and completeness of the data, and timely supplemented the address data in 2016 when so directed. *See supra* at Section II.B. Like so many of the other challenges Defendants' raise, the attempt to fault Dr. Bendick for what MVP's own counsel recognized was a discovery dispute is improper and far outside the bounds of a *Daubert* inquiry.[52]

Finally, Defendants' criticism of Dr. Bendick's use of both "census blocks" from the 2010 decennial U.S. Census and ACS data, Mot. at 24, ignores the fact that Dr. Bendick's analysis is comprised of two related yet distinct computations, both of which are grounded in well-accepted techniques. The argument reflects a fundamental misapprehension of geocoding, which Dr. Bendick did when he calculated the actual representation rate of non-Hispanic African Americans assigned to GSB, and the calculation of the MVP Cicero's Office reasonable recruitment area, which Dr. Bendick calculated in the first part of his analysis when he determined the expected representation rate of non-Hispanic African Americans. *Compare* Bendick Revised Decl. at 15 n.3. (explaining the accepted use of decennial Census data in geocoding) and at ¶¶ 11-20 (explaining that ACS data is the appropriate data source to compute the racial/ethnic characteristics of MVP job seekers residing in a geographic area). As Dr. Bendick explains in his report, both techniques are well-established in the field. *Id.* Contrary to Dr. Amidon's representation, the census does not "caution[] against" comparing across different

---

[52] For similar reasons, Defendants' argument that Dr. Bendick should have investigated the reasons for some workers' "suspect hours" fundamentally misapprehends Dr. Bendick's shortfall analysis, *see* Bendick Revised Decl. at 20, and also faults him for not joining in Defendants' supposition as to the reasons for fluctuations in the hours assigned for specific workers. Mot. at 23-24. Indeed, Defendants speculate about the impact of potential differences in hours for assigned workers, but because they instructed their expert not to do an affirmative analysis of her own, the most they can say is that the reported hours for *one worker* is "suspect." *Id.* Such supposition, which Defendants cannot even fully articulate, is not a basis to find Dr. Bendick's analysis unreliable.

surveys; it simply advises users to "[u]se caution" when doing so.  U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data: What General Data Users Need to Know.* U.S. Government Printing Office, Washington, DC, 2008, page 25; *see also* Amidon Decl. at ¶48.  As Defendants do not, and cannot, show that Dr. Bendick failed to do that in his analysis, this criticism is nothing more than a red herring.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike the Declaration of Marc Bendick, Jr., Ph.D. should be denied.

Respectfully Submitted,

Dated: August 21, 2018

*/s/Christopher J. Williams*