## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| JAMES ZOLLICOFFER, ANTWOIN HUNT, and NORMAN GREEN, on behalf of themselves and similarly situated laborers, | |
| Plaintiffs, | Case No. 13 C 1524 |
| v. | Judge Ellis |
| GOLD STANDARD BAKING, INC., PERSONNEL STAFFING GROUP, LLC d/b/a MOST VALUABLE PERSONNEL d/b/a MVP, | Magistrate Judge Kim |
| Defendants. | |

## DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO STRIKE THE DECLARATION OF MARC BENDICK, Ph.D.

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  THE COURT SHOULD STRIKE DR. BENDICK'S OPINIONS. ................................ 3

    A.  There is no basis for excusing deficiencies in Dr. Bendick's work....................... 3

    B.  Plaintiffs effectively concede Dr. Amidon's "primary critique" of Dr. Bendick's opinion regarding expected representation. .......................................... 9

    C.  Dr. Bendick's estimates of actual representation are unreliable......................... 17

III.  THE COURT SHOULD STRIKE DR. BENDICK'S REBUTTAL DECLARATION. ................................................................................................ 19

    A.  The court should strike Dr. Bendick's rebuttal declaration because it is inadmissible hearsay. ............................................................................... 19

    B.  Dr. Bendick's newly disclosed opinions should be stricken as untimely. ........... 20

IV.  CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berkheimer v. Hewlett-Packard Co.*,
  No. 12 C 9023, 2016 U.S. Dist. LEXIS 68750 (N.D. Ill. May 25, 2016)
  (Gilbert. M.J.) ...........................................................................................................20, 21, 22

*Borom v. Town of Merrillville*,
  No. 2:07 cv 98, 2010 U.S. Dist. LEXIS 108034 (N.D. Ind. Oct. 8, 2010) ..............................22

*Butler v. Sears Roebuck & Co.*,
  No. 06 C 7023, 2010 WL 2697601 (N.D. Ill. July 7, 2010) ...................................................21

*C.W. v. Textron, Inc.*,
  807 F.3d 827 (7th Cir. 2015) ..................................................................................................2

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 113 S. Ct. 2786 (1993)......................................................................................2

*Digisound-WIE, Inc. v. BeStar Techs., Inc.*,
  No. 07 C 6535, 2008 U.S. Dist. LEXIS 39860 (N.D. Ill. May 16, 2008)
  (Lindberg, J.)..........................................................................................................................19

*Dura Auto Sys. of Indiana, Inc. v. National American Ins. Co.*,
  382 F.3d 546 (7th Cir. 2004) ................................................................................................11

*Eli Lilly & Co. v. Arch Ins. Co.*,
  No. 1:13-cv-01770-LJM-TAB, 2017 U.S. Dist. LEXIS 105833 (S.D. Ind. July
  10, 2017) ...............................................................................................................................19

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
  744 F. Supp. 2d 870 (E.D. Wis. 2010)...................................................................................16

*Heatherly v. Univ. of Ala. Bd. of Trs.*,
  No. 7:16-cv-00275-RDP, 2018 U.S. Dist. LEXIS 118869 (N.D. Ala., July 17,
  2018), *appeal filed,* No. 18-13439 (Aug 15, 2018) ...............................................................16

*Int'l Ins. Co. v. Caja Nacional De Ahorro Y Seguro*,
  293 F.3d 392 (7th Cir. 2002) .................................................................................................19

*Lowe v. CVS Pharmacy, Inc.*,
  No. 14 C 3687, 2017 WL 2152385 (N.D. Ill. May 17, 2017) ......................................21, 22, 23

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Med. Mut. of Ohio v. AbbVie Inc. (In re Testosterone Replacement Therapy
Prods. Liab. Litig.)*,
MDL No. 2545, Nos. 14 C 1748, 14 C 8857, 2018 U.S. Dist. LEXIS 125041
(N.D. Ill. July 26, 2018)......................................................................1, 2, 15, 16, 17

*Ostrow v. Globecast Am. Inc.*,
No. 10-61348-CIV-ROSENBAUM, 2011 U.S. Dist. LEXIS 117889 (S.D. Fla.
Oct. 13, 2011), *aff'd*, 489 F. App'x 433 (11th Cir. 2012)...........................................19

*Stanfield v. Dart*,
No. 10 C 6569, 2013 WL 589222 (N.D.Ill. Feb.14, 2013)....................................21

*Vasquez v. Caterpillar Logistics, Inc.*,
No. 1:15-CV-398-TLS, 2017 U.S. Dist. LEXIS 174654 (N.D. Ind. Oct. 20,
2017) .........................................................................................................................1

*Welch v. Eli Lilly & Co.*,
No. 1:06-cv-0641-RLY-JMS, 2009 U.S. Dist. LEXIS 21417 (S.D. Ind. Mar.
16, 2009) ................................................................................................................22

**Statutes**

28 U.S.C. § 1746.......................................................................................................19

**Other Authorities**

Rule 26(a)(2)(D)(ii) ..................................................................................................21

Defendants Personnel Staffing Group, LLC ("MVP") and Gold Standard Baking, Inc. ("GSB") (collectively, "Defendants") respectfully submit this reply memorandum in further support of their Motion to Strike the Declaration of Marc Bendick, Ph.D. ("Motion to Strike"). For the reasons set forth below and in the Motion to Strike, the Court should disregard the declarations and other opinions offered by Marc Bendick, Ph.D. ("Dr. Bendick").

I.    **INTRODUCTION**

To succeed on their claims under 42 U.S.C. §1981, Plaintiffs must prove that intentional race discrimination was the "but for" cause of them not being referred to GSB. *Vasquez v. Caterpillar Logistics, Inc.*, No. 1:15-CV-398-TLS, 2017 U.S. Dist. LEXIS 174654, at *28-29 (N.D. Ind. Oct. 20, 2017) (citing *Smith v. Wilson*, 705 F.3d 674 (7th Cir. 2013)). They ultimately seek to do this on a class-wide basis, which is a significant burden indeed. In their motion for class certification, they rely on social science to argue that they can establish discrimination on a class-wide basis. They claim to show that the number of non-Hispanic African Americans assigned by MVP from its Cicero office to GSB during the alleged Section 1981 statute of limitations period (the "Relevant Period")[1] was statistically significantly lower than it should have been and therefore suggestive of intentional class-wide race discrimination. That argument is based exclusively on the opinions of Marc Bendick, Ph.D. ("Dr. Bendick"), their proffered expert witness, who formed his conclusions largely based on addresses supplied to him by Plaintiffs' counsel in 2014 (the "List of 18,191 Referrals").

"[W]hen an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Med. Mut. of Ohio v. AbbVie Inc. (In re Testosterone*

---

[1] Defendants dispute that the statute of limitations extends to 2009 and therefore reference the "Relevant Period" for purposes of this motion only.

1

*Replacement Therapy Prods. Liab. Litig.),* MDL No. 2545, Nos. 14 C 1748, 14 C 8857, 2018 U.S. Dist. LEXIS 125041, at *292-93 (N.D. Ill. July 26, 2018) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). "[A]n [expert] opinion must be 'connected to the existing data' by more than 'the *ipse dixit* of the expert.'" *Id.* at * 294 (emphasis in original) (quoting *GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, (1997)). The fact that Dr. Bendick may have more years in the field of labor economics than Dr. Amidon does not entitle his views to any greater deference, especially where he makes assertions that are unsupported by citation or logic, as described below. Dr. Bendick's opinions are inadmissible because they are not based on a fair rendition of the facts of the case, are not premised on sound science, and because he has not reliably applied sound scientific principles to the facts of the case.

Given the flaws in Dr. Bendick's opinions identified in Defendants' Motion to Strike and below, Plaintiffs now argue in opposition that his work is, well, good enough for the class certification phase. Dr. Bendick even asserts that "greater clarity will emerge"[2] later in the case and any flaws in his work can be corrected later, if the Court will just allow this case to proceed to the merits as a class action. Plaintiffs and Dr. Bendick focus on the results of his analysis and argue that even if his numbers are wrong, they are close to what they think the results should be had Dr. Bendick provided an adequate analysis on the front end. Pls' Opp. 2, 16-18, Bendick Rebuttal Decl. ¶¶ 18, 22, 26-32. That ignores what the Supreme Court said in *Daubert*, however: the Court's inquiry should focus on the expert's "principles and methodology, *not on the conclusions that they generate.*" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95, 113 S. Ct. 2786, 2797 (1993) (emphasis added); *see also C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (explaining that the "key to the gate is not the ultimate correctness of the

---

[2] Rebuttal Declaration of Marc Bendick, Ph.D., dated August 20, 2018 ("Bendick Rebuttal Decl.") (ECF No. 638-6) ¶ 26.

expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion."). Moreover, the argument that Dr. Bendick's newest opinions are similar to his earlier opinions assumes the reliability of the earlier opinions.

This case has been pending for well over 5 years, and Plaintiffs have no legitimate explanation for Dr. Bendick's failure to use relevant data and follow generally accepted professional standards for his profession. Plaintiffs were provided *all of the information* that Dr. Amidon asserts was excluded by Dr. Bendick. Plaintiffs *were never under any obligation to return or destroy the nearly 9,000 addresses arbitrarily excluded* from Dr. Bendick's analyses. They still have provided *no explanation whatsoever for how they selected the addresses* that were included in the List of 18,191 Referrals. Yet, Dr. Bendick blindly relied on a compilation of addresses prepared by Plaintiffs' counsel to determine the geographic area that is the core foundation of his opinion regarding the expected availability of non-Hispanic African Americans. None of his previously articulated opinions (those in his March 19, 2018 Declaration and his May 31, 2018 Revised Declaration) are sufficiently reliable or grounded in the facts of this case.[3] Moreover, as described in Section III below, the new opinions contained in his Rebuttal Declaration are no better and, in any event, should not even be considered by the Court.

## II.     THE COURT SHOULD STRIKE DR. BENDICK'S OPINIONS.

### A.     There is no basis for excusing deficiencies in Dr. Bendick's work.

Plaintiffs wrongly (and without any legal citation) suggest that the Court should excuse their own failings and those of their expert and accept Dr. Bendick's fundamentally flawed report to certify a class. The Court must carry out its role as a gatekeeper in assessing expert

---

[3] Defendants do not dispute that Dr. Bendick is a credentialed and experienced labor economist who has testified in other cases. Contrary to Plaintiffs' assertion (Pls' Opp. 1), however, Defendants dispute the validity of Dr. Bendick's methodology and the validity of his conclusions in this case.

testimony under the *Daubert* standards. Neither those standards, nor Plaintiffs' burden under Rule 23, can be relaxed.

This is not as Plaintiffs argue "a discovery issue between counsel." Pls' Opp., 19. Plaintiffs' citation to the Deposition of Dr. Amidon for the proposition that the undersigned counsel for MVP described the problem with Dr. Bendick's source data as a "discovery issue between counsel" is another misleading statement. The transcript makes clear that the issue at the time was Plaintiffs' counsel's request that Dr. Amidon provide Dr. Bendick with a list of the 390 individuals that were improperly excluded by Plaintiffs' counsel from the List of 18,191 Referrals, Amidon Dep. 63:13-67:6[4], which is an issue that Plaintiffs do not address in their opposition, except to say the number was not that large.

Plaintiffs blatantly mischaracterize the history of this case.[5] They have for some time had in their possession data from which a competent labor economist presumably could have compiled a set of addresses associated with the relevant time period for laborers assigned out of MVP's Cicero office. Yet, Plaintiffs chose not to retain a labor economist or employment analyst to do that work and instead relied upon their counsel to decide what addresses to include for an estimate of expected representation. And now Plaintiffs' counsel insists that they no longer have the entire body of data that was provided to them.

Plaintiffs admit they were advised over four years ago by Dr. Bendick that in order to estimate expected representation of non-Hispanic African Americans for this case, he would need "the addresses for all laborers *assigned out of the Cicero Office during the relevant time period* … to establish the geographic area from which the MVP Cicero office drew laborers."

---

[4] The transcript of the August 9, 2018 deposition of Carole M. Amidon, Ph.D is referred to herein as "Amidon Dep. __." (ECF No. 644-1, attachment 6).

[5] Submitted as Exhibit 3 to this Reply Memorandum is the Supplemental Declaration of Elliot Richardson ("Supp. Richardson Decl."), which elaborates on the procedural history set forth in the Declaration of Christopher Williams, dated August 20, 2018.

Williams Decl. ¶¶ 9-11 (emphasis added). Plaintiffs sought the addresses in MVP's business records associated with laborers who had been assigned out of the Cicero office during the Relevant Period. Due to system limitations documented clearly in a sworn statement filed with the Court on August 21, 2014 (ECF No. 219) MVP was unable to generate these business records as requested to reflect the association between names, addresses and year of assignment. So the parties reached an agreement regarding the data that would be produced by MVP to Plaintiffs. The fact that MVP was able *three years later* to produce data in a different format hardly suggests that this was a misrepresentation. More to the point, as described below MVP provided the very data Plaintiffs are now arguing about *and they chose not to have their expert use it*.

 In August 2014 MVP agreed to produce two data sets: one that contained names and addresses of laborers assigned from MVP's Cicero office since that office was opened in approximately the year 2000, and another from the payroll database that reflected names of individuals who received payments from MVP's Cicero office during the limitations period. Plaintiffs' counsel explained to the Court what he would do with these data:

> There are programs you can purchase which are add-ons to Excel which allow you to *identify the same names* from two different lists, and we will use those to identify those from the larger list. And *anybody* not identified from the smaller list will be deleted from the larger list.

Williams Decl. ¶¶ 19-20, Attachment 3, p. 18 (emphasis added). Per the parties' agreement, Plaintiffs were required to return to MVP and destroy all copies of data *regarding individuals who were outside the scope of the case*, after creating their list. Plaintiffs *were not required to return any data* regarding individuals whom Plaintiffs' counsel determined were assigned out of the Cicero office during the Section 1981 statute of limitations period. Nor was there any agreement between the parties that Plaintiffs' counsel's planned compilation of data would

somehow become an agreed-upon data set for use by experts, let alone even any discussion about which addresses Plaintiffs' counsel would include for the individuals identified. Suppl. Richardson Decl. ¶¶ 4-7; August 21, 2014 Transcript 15:24-21:5 (ECF No. 644-1, attachment 3).

In September, 2014 MVP produced two computer files in comma-separated values ("CSV") format. One file contained, among other things, names and addresses of assignees from the MVP Cicero office since that office was opened in approximately 2000 to September 1, 2014 (the "Cicero Office CSV File"). Richardson Decl. ¶ 9.[6] The Cicero Office CSV File did not contain separate columns for "Address" and "Alternate Address," as misstated by Plaintiffs' counsel at paragraph 22 of his declaration.

Upon reviewing this assertion in Plaintiffs' counsel's declaration, the undersigned counsel for MVP reminded Plaintiffs' counsel that he was provided with a copy of the Cicero Office CSV File immediately following Dr. Bendick's deposition in June of this year, which he could have reviewed to refresh his recollection concerning the content of the file. Additionally, MVP promptly provided Plaintiffs' counsel with his own original correspondence regarding this file *and the computer disc he returned to Korey Richardson LLC* in January 2017, so that he could review that as well. August 29, 2018 Letter from K. Gage to C. Williams, attached hereto as Exhibit 1; Suppl. Richardson Decl. ¶ 17. As of this filing, Plaintiffs only response is a letter dated August 31, 2018, in which counsel asserts, in part, "[t]here is no way to verify the source file at this point because of MVP's insistence that all copies of the source files be returned and/or destroyed by Plaintiffs' counsel." August 31, 2018 Letter from C. Williams to K. Gage, attached hereto as Exhibit 2.

Instead, individuals who had multiple addresses in MVP's records were reflected in separate rows of data, as illustrated in Table 2 of the Declaration of Carole M. Amidon, Ph.D.

---

[6] The July 6, 2018 Declaration of Elliot Richardson is referred to herein as "Richardson Decl. __." (ECF No. 601-1).

submitted with Defendants' Motion to Strike. Amidon Decl. ¶ 19, Table 2. The Cicero Office CSV File contained 64,142 rows of information, in many cases multiple rows of information for a single individual. The second CSV file contained, among other things, the names of individuals who received payments from MVP's Cicero office between November 1, 2009 and September 1, 2014, but it did not contain addresses. Richardson Decl. ¶ 10. MVP had previously produced a data file that contained, among other things, the names of individuals who had been assigned by MVP to GSB. *Id.* ¶ 8.

Upon information and belief, either through the name matching process he described to the Court in 2014 or the MVPID matching process he describe in his August 20, 2018 declaration, Plaintiffs' counsel generated the List of 18,191 Referrals. Plaintiffs still have not disclosed how their counsel selected *which addresses* associated with those 18,191 individuals to capture from the Cicero Office CSV for the List of 18,191 Referrals. It is undisputed however that he did not capture all of those addresses. Amidon Decl. ¶ 19[7]; Bendick Rebuttal Decl. ¶ 9. As noted above, Plaintiffs were not required or expected to return any data regarding the individuals he identified. Counsel's destruction of these records without express agreement only undermines the reliability of Dr. Bendick's analysis, as Plaintiffs' counsel can no longer confirm the source of the data that he used to assemble the List of 18,191 Referrals.

Meanwhile, Plaintiffs specifically asked for updated data after a stay of the case was lifted, presumably to prepare for their motion for class certification, and they retained the Cicero Office CSV File until early 2017. Approximately two years and two months after Plaintiffs' counsel says he created the List of 18,191 Referrals, he returned the disc containing the Cicero Office CSV File, explaining that "[i]n light of [the parties'] agreement that MVP will produce *an*

---

[7] The July 6, 2018 Declaration of Carole M. Amidon, Ph.D is referred to herein as "Amidon Decl. __" (ECF No. 601-9).

*updated version* of the [Cicero Office CSV File] to include data up to the present as well as an updated version of the data file named 'MVP Employees Paid 11-1-09 to Present' to include data up to the present, ...." Supp. Richardson Decl. ¶ 17, Ex. I. Updated data files were produced by MVP in late 2017, and those data were produced in *separate files broken down by year*. Suppl. Richardson Decl. ¶ 22.

Dr. Bendick obviously used the updated files MVP produced in 2017 reflecting who was assigned to GSB to prepare his estimates of actual representation of non-Hispanic African Americans. Otherwise he would not have had actual representation estimates for 2014 and 2015. Yet, neither Plaintiffs' counsel's declaration nor Dr. Bendick's Rebuttal Declaration contain any explanation for Dr. Bendick's failure to use the data produced by MVP in 2017 for his opinions regarding *expected representation*. In any case, the consequences for that failure should not fall on Defendants.

Plaintiffs' counsel misleads the Court when he states that since October 2014, MVP "refused [to] engage in a discussion about whether the data [compilation he created could] constitute[] a common database ..." "Williams Decl." ¶ 27. There were multiple written communications over that very subject after October 2014 and into 2017. Suppl. Richardson Decl. ¶¶10-19. At one point, Plaintiffs sought agreement on a *list of individuals* assigned out of the Cicero office. Supp. Richardson Decl. ¶ 11. But later, Plaintiffs sought something different, agreement on *hours worked by individuals assigned to GSB*. *Id.* ¶ 19. Neither of these proposals covered the addresses that are now at issue. In any case, it was clear that MVP would not and did not stipulate to a common database of any sort. Moreover, Plaintiffs' counsel never provided MVP with any explanation of how he selected the addresses he used to populate his two address columns in the List of 18,191 Referrals from those in the Cicero Office CSV File.

8

Finally, Plaintiffs' argument that Defendants should be estopped from objecting to Dr. Bendick's opinions, Pls' Opp. 8, is unsupported by law or fact. As noted above, MVP explicitly notified Plaintiffs' counsel that it would not agree to any common database. (Plaintiffs do not even suggest that they requested, much less received, GSB's agreement.) Prior to disclosures in connection with the instant motion for class certification, Plaintiffs never provided expert disclosures as required by Rule 26(a)(2). So it was only in connection with Plaintiffs' class certification motion that Defendants could have stated any objections to his opinions, which they did in a timely manner in response to the class certification motion.

There is simply no basis whatsoever for Plaintiffs to blame MVP for the failings of their counsel and their expert.

## B. Plaintiffs effectively concede Dr. Amidon's "primary critique" of Dr. Bendick's opinion regarding expected representation.[8]

Dr. Bendick's opinion regarding expected representation of non-Hispanic African Americans is a statistical estimate, based on other statistical estimates, based upon a recruitment area defined by a set of addresses arbitrarily selected by Plaintiffs' counsel. At each step in the process of developing his opinion Dr. Bendick has failed to follow accepted professional methodology, as described in Defendants' Motion to Strike. Plaintiffs' Response In Opposition to Defendants' Motion to Strike ("Pls' Opp.") fails to resurrect his opinions.

Even before Defendants' Motion to Strike, Dr. Bendick agreed "in some abstract sense" he said, that it is important to understand where data underlying his analysis comes from. Bendick Dep. 78:11-14[9]. "[I]t would *not be standard professional practice among economists and other employment analysts to rely on . . . records of unclear origin and relevance*," he

---

[8] Dr. Bendick's citations to the Code of Federal Regulations, a human resources text book and Adam Smith's, *The Wealth of Nations*, Bendick Rebuttal Decl. ¶ 12, n. 15, are irrelevant, as none of those authorities addresses his failure to connect his expected representation analysis to the facts of this case.

[9] The June 21, 2018 deposition of Marc Bendick, Jr., Ph.D. is referred to herein as "Bendick Dep. __." ( ECF No. 601-8).

explains further in his Rebuttal Declaration. Bendick Rebuttal Decl. ¶¶ 10-11. "Well," he said at his deposition, "if [the data underlying his analyses] don't correspond to the facts in this case, then that would make it problematic to have relied on them in the analysis." Bendick Dep. 72:5-9. "If there's a problem with the data set," Dr. Bendick suggested, "the adversarial process" turns up those problems. Bendick Dep. 78:11-20. It is now even clearer than before that there is a problem with the address data set underlying Dr. Bendick's opinion regarding expected representation. Those data were not compiled in a manner consistent with standard professional practices and therefore the statistical estimate based upon those data should not be accepted for purposes of class certification. In his deposition testimony and now in his Rebuttal Declaration, Dr. Bendick effectively concedes this point.

Dr. Bendick defined his so-called reasonable recruitment area based upon a collection of specific Public Use Microdata Areas ("PUMAs"). Revised Bendick Decl. ¶¶ 11-16.[10] As noted in the Motion to Strike, the estimated percentage of Black Non-Hispanic individuals in the 18 PUMAs shown in Dr. Bendick's Table 1A varies widely, from as low as 0.9% in one PUMA to as high as 98.2% in another. In his Table 1B, those estimated percentages vary similarly across 19 PUMAs, ranging from a low of 0.8% in one PUMA to as high as 97.8% in another. These estimated percentages are, as described by Dr. Amidon, based upon the American Community Survey and have associated margins of error. Dr. Bendick's opinion regarding expected representation is then derived using a weighted average of these individual PUMA estimates. So plainly, representation of Black Non-Hispanic individuals varies widely depending upon which PUMAs are used to define a reasonable recruitment area for this case.[11] Whether Dr. Bendick

---

[10] Dr. Bendick's May 31, 2018 declaration is referred to herein as "Revised Bendick Decl. ¶ __." (ECF No. 601-4).
[11] Amidon Decl. ¶¶ 13, 19.

used the correct PUMAs *for this case*, however, depends upon whether he used a relevant set of addresses to select them. According to the opinions of both of the experts in this case, he did not.

It is undisputed that Dr. Bendick identified his PUMAs based upon a subset of addresses[12] contained in the List of 18,191 Referrals compiled by Plaintiffs' counsel. Dr. Bendick does not know whether any or all of the addresses he used from Plaintiffs' counsel's List of 18,191 Referrals relate to the Relevant Period, however. As described below, the address data produced by MVP in 2014 covered a period of time starting in approximately the year 2000, which included approximately 9 years of data potentially outside the Relevant Period. Dr. Bendick knows no more about the addresses he used than he knows about the over 9,000 addresses that he did not use, because he does not know how Plaintiffs' counsel selected addresses to be included on the List of 18,191 Referrals. So it is disingenuous for Plaintiffs to say they "continue to believe the universe of addresses that Dr. Bendick analyzed is the correct one for this lawsuit …." Pls' Opp. 4.

Dr. Bendick merely assumed that Plaintiffs' counsel provided him all of the relevant information that had been received from MVP.[13] Conspicuously, Dr. Bendick says nothing in his Rebuttal Declaration about the origin or relevance of the address information that Plaintiffs' counsel chose to include in the List of 18,191 Referrals. Nor does he say anything about the origin or relevance of *the subset of those addresses* he chose to use for his analysis. *See* Memo in Support of Motion to Strike, 13-14. Nor does he claim to have adequately supervised the compilation of the list of 18,191 Referrals. But as described below he insists now that inclusion of addresses of unknown origin or relevance would not be proper.[14]

---

[12] As described below the "Address" and "Alternate Address" designations were not data fields produced by MVP.
[13] Bendick Dep. 56:12-22.
[14] Plaintiffs attempt to distinguish *Dura Auto Sys. of Indiana, Inc. v. National American Ins. Co.*, 382 F.3d 546, 562 (7th Cir. 2004), is unavailing. Pls' Opp. 21-22. Dr. Bendick blindly relied on Plaintiffs' counsel's discretionary judgment about what addresses to include.

Dr. Bendick doubles-down on his blind reliance on a sub-set of the addresses selected by Plaintiffs' counsel, saying that "the standard professional practice among economists and other employment analysis is to *examine only the first address listed*." Bendick Rebuttal Decl. ¶ 7 (emphasis added). But such a practice could only possibly make sense when dealing with business records maintained by an employer in the ordinary course of business, which could arguably give rise to inferences regarding the relevance of the data based upon the labels assigned by the employer. Amidon Rebuttal Decl. ¶ 6[15]; *see also* Bendick Rebuttal Decl. ¶ 7 ("This practice reflects the widespread observation that in *employers' human resource management records,* the first reported address is most likely to be where a job applicant or employee could be contacted by the employer at the time the record was created …") (emphasis added). For example, if two employee addresses were labeled *in an employer's human resource management records* as "address" and "former address" Defendants would not quibble with Dr. Bendick if he suggested that a reasonable inference could be drawn from this ambiguity that the second address came from an earlier point in time. Such inferences do not logically arise, however, when the data have been organized and labeled by an advocate for one of the parties in the case. Amidon Rebuttal Decl. ¶ 7; *see also* Bendick Dep. 71:10-73:7 (Dr. Bendick conceding that he did not know who created the column headings and "wouldn't consider [Plaintiffs' counsel's] opinion important" on the subject of which addresses for people assigned out of the Cicero office to use). Indeed, blindly relying on a set of addresses selectively compiled by Plaintiffs' counsel under these circumstances *is not* the standard professional practice among economists and other employment analysts. Amidon Rebuttal Decl. ¶ 7.

---

[15] Submitted as Exhibit 4 to this Reply Memorandum is the Rebuttal Declaration of Carole M. Amidon, Ph.D ("Amidon Rebuttal Decl.").

Plaintiffs cannot escape these errors by pointing to Dr. Bendick's self-serving statements that "the degree of incompleteness, ambiguity, and other limitations of these MVP records is within the normal range for typical employer records," or that "such analyses of less than perfect employer records are commonly considered reliable, acceptable, and useful …" Bendick Rebuttal Decl. ¶¶ 45-46. The data Dr. Bendick relied upon for his expected representation estimate, however, *was compiled by Plaintiffs' counsel not by MVP*. Moreover, Dr. Amidon did not say that "the data currently available in this case are inadequate to support an appropriate analysis of class certification issues." Pls' Opp. 19. Rather, she suggested that Dr. Bendick should have asked more questions about the data in the case. Amidon Dep. 146:13-20 ("Given the data for the expected representation figure, I would want to know more information about the databases we have with address in them and which people does it cover, which years does it cover, which pieces of the data that went into figuring out the expected availability, and what – what those fields actually mean, and what the lines all mean.") The flaws described above have nothing to do with the incompleteness, ambiguity or other limitations *of MVP's records*.

Dr. Bendick's post-hoc justification for the exclusion of addresses produced in discovery that were associated with the 18,191 laborers identified by Plaintiffs' counsel is similarly misplaced. Rebuttal Bendick Decl. ¶¶ 9-11. He claims that those addresses were excluded as a result of "procedures that had been agreed to by the parties and approved by Magistrate Judge [K]im." *Id.* ¶ 9. As described below, there was an *agreement* that MVP would produce certain data files and an *understanding* that Plaintiffs' counsel intended to compile a list of *individuals* who were assigned out of the Cicero office during the relevant time period. There was no agreement or understanding between the parties regarding which addresses for those individuals would be used, let alone what use might be made of such addresses. Magistrate Judge Kim certainly did not have any involvement in Plaintiffs' counsel's selection of which addresses to

13

include. And while Plaintiffs' counsel belatedly described on August 20, 2018, how they arrived at the list of 18,191 laborers, Williams Decl. ¶¶ 23-25,[16] the procedures Plaintiffs' counsel used to selectively identify addresses to include in their List of 18,191 Referrals remain a mystery.

In any event, and maybe most significantly, Dr. Bendick concedes that the accuracy and reliability of an expert's work depends upon the relevance of the data on which she or he relies. The Motion to Strike forced Dr. Bendick to consider the fact that he excluded addresses produced by MVP in discovery that are associated with the 18,191 laborers identified by Plaintiffs' counsel. In response, he insists that to be included in his analysis an address first would need to be relevant to the case. Bendick Rebuttal Decl. ¶ 7 ("For the present analysis, workers' actual location at the time she or he was applying to or working through MVP is the relevant information."). If an address "related to years prior to commencement of the class period in 2009,"[17] Dr. Bendick suggests it should not be included. Bendick Rebuttal Decl., ¶¶ 10-11. Including data of unclear origin and relevance, he explains, would "tend to reduce, rather than increase, the accuracy and reliability of" the analysis. *Id.* But that is *precisely* what he did in the first instance.

So Drs. Amidon and Bendick apparently agree on the general proposition that the data underlying the expected representation estimate must be relevant to the case. This is Dr. Amidon's "primary critique"[18] of Dr. Bendick—that he offered an opinion regarding expected representation, without knowing the origin of the addresses he used to identify the PUMAs that

---

[16] Christopher J. Williams's August 20, 2018 Declaration is referred to herein as "Williams Decl. __." (ECF No. 644-1).

[17] Dr. Bendick criticizes MVP's expert, Carole M. Amidon, Ph.D. ("Dr. Amidon") for what he characterizes as her suggestion that he should have included all of the addresses that he excluded. And the Plaintiffs' criticize Dr. Amidon for not preparing an alternative analysis. As she explained at her deposition, Dr. Amidon said that she would need to do additional diligence regarding the relevance of data produced in discovery before she could prepare an alternative analysis. Amidon Dep. 145:19 – 149:13. So it is simply incorrect for Dr. Bendick to state in his Rebuttal Declaration that he "implement[ed] Dr. Amidon's suggestions." Bendick Rebuttal Decl. ¶¶ 16-20. Plus, unlike Dr. Bendick, who has been involved in this case for more than four and a half years, Dr. Amidon has been involved in this case for just over three months. Amidon Rebuttal Decl. ¶¶ 2-3; Amidon Dep. 11:6-17, Ex. C.

[18] Plaintiffs' Response In Opposition To Defendants' Motion To Strike ("Plaintiffs' Response"), 1.

define his so-called reasonable recruitment area, *much less whether those addresses were relevant to this case*. As Dr. Amidon explains in order to properly define a reasonable recruitment area for this case and, therefore, to estimate expected representation, Dr. Bendick should have made further inquiries regarding the address data, which he still apparently has not done. Amidon Dep. 146:9-147:4.

Moreover, as described below, in response to Plaintiffs' request MVP supplemented its data production in 2017, well before Dr. Bendick prepared his various declarations in support of class certification, to provide the Cicero office referral data and the MVP assignment data by year from 2009 through 2015. Dr. Bendick took the time to update his actual representation analysis to account for that 2017 data production.[19] Revised Bendick Decl. ¶ 27. As noted above, Plaintiffs have relied upon Dr. Bendick for over four years to provide them with his expertise on how best to prepare an analysis. He plainly understands the importance of relying only on relevant data; indeed he criticizes any suggestion that data of unclear origin or relevance be included. Bendick Rebuttal Decl. ¶¶ 10-11. The fact that he chose not to update his expected representation estimate to rely on relevant data produced by MVP in 2017 is not Defendants' fault. Nor is it a basis for the Court to find Dr. Bendick's analysis reliable.

Therefore, Dr. Bendick's reliance on Plaintiffs' counsel's address compilation and his use of the "first" address was based upon pure speculation as to whether the address Plaintiffs' counsel provided truly was the "first" address in MVP's files or really could be considered the relevant address in the many instances where MVP's records showed multiple addresses for a single employee. This issue fatally undermines the reliability of Dr. Bendick's expected representation figure. *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 2018 U.S.

---

[19] He did this despite the fact that Defendants had not formally raised any objections to his earlier proffered opinions. Meanwhile, Defendants had no reason or obligation to raise any objections until Plaintiffs relied on Dr. Bendick's opinions as set forth in his Declaration and Revised Declaration.

Dist. LEXIS 125041, at *326-27 (N.D. Ill. July 26, 2018) (excluding expert testimony based on a "gaping hole" in expert's logic where expert relied on counsel's selective provision of information and "did not make an investigation of the evidence sufficient to render an admissible expert opinion"); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010) (finding methodology underpinning expert's opinion unreliable where expert "ma[de] several incredible assumptions that belie basic logic and as a consequence lead to the inescapable conclusion that [the expert was] completely speculating regarding his ultimate conclusions."). Notably, this is not the first time a court has been asked to disregard Dr. Bendick's opinions because of his reliance on unsupported factual assumptions. *See Heatherly v. Univ. of Ala. Bd. of Trs.*, No. 7:16-cv-00275-RDP, 2018 U.S. Dist. LEXIS 118869, at *53 (N.D. Ala., July 17, 2018) (rejecting Dr. Bendick's opinions in a pay discrimination case because his "analyses are based on the unsupported assumption that jobs within each pay grade are comparable" and noting that "[t]his statistical evidence 'does not have any probative value in establishing a prima facie case of disparate treatment.") (internal citations omitted), *appeal filed,* No. 18-13439 (Aug 15, 2018).

Judge Kennelly's decision in *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, *supra*, is instructive. In that case two of the plaintiff's experts' opinions were rejected under Rule 702 in connection with Judge Kennelly's decision to deny class certification. One expert, Dr. Rosenthal, was offered by the plaintiffs "as a common basis to establish" causation on a class-wide basis. 2018 U.S. Dist. LEXIS 125041, at *305-06. Because his statistical models were insufficient to support the plaintiff's causation theories, his opinions were stricken. Judge Kennelly found that the second expert, Mr. Wilkinson, was sufficiently qualified as an expert based upon his "extensive professional experience …," but his opinions were excluded because they were not sufficiently grounded in the facts of the case. *Id.* at *322-27. "Mr. Wilkinson's opinion," the court observed, "relies heavily on a compilation of materials" much of which came

16

from the plaintiff's complaint, and he testified that he relied upon the plaintiff's counsel to select the materials that went into the compilation. *Id.* at *326. According to Judge Kennelly, "Mr. Wilkinson did not make an investigation of the evidence sufficient to render an admissible expert opinion." *Id.*

Here too Plaintiffs rely on their expert as a common basis to establish causation, Plaintiffs' Reply in Support of Revised Motion for Class Certification, 10; Dr. Bendick relies upon a compilation of information prepared by Plaintiffs' counsel to form his opinions; and he failed to make an investigation of the evidence sufficient to render an admissible expert opinion.[20]

## C. Dr. Bendick's estimates of actual representation are unreliable.

For the reasons outlined in Section IV of Dr. Amidon's Declaration, Dr. Bendick's estimates of actual representation of non-Hispanic African Americans are likewise unreliable and should not be considered.

Dr. Bendick ignores most of Dr. Amidon's criticisms of his estimates, which go well beyond the identification of a Microsoft Excel error (though that alone is a sign of the lack of care and attention Dr. Bendick gives to his work). For example, Dr. Bendick does not address the fact that his estimate of actual representation in 2009 is based upon the assignment of a probability of being non-Hispanic African American to only 41.94% of the referral population, whereas his estimate for 2015 is based upon probability assignments for 86.78% of the referral population. Amidon Decl. ¶¶35-37. Presumably, this is because he must concede that the estimates for the earlier years are therefore *even less reliable* than his estimates for 2014 and 2015. Amidon Rebuttal Decl. ¶ 16.

---

[20] As described in more detail in Dr. Amidon's Rebuttal Declaration, Dr. Bendick's excuse for not previously reporting margins of error associated with his various estimates confuses two distinctly different concepts. One concerns errors in (and errors underlying) his expected representation estimate. The other concerns the magnitude of the difference between that estimate and his estimate of actual representations. Amidon Rebuttal Decl. ¶¶ 21-28.

17

Defendants do not dispute that "studies based upon … employer data are also frequently the basis for scholarly research on employment, which is accepted for publication in 'blind refereed' research journals," as Dr. Bendick asserts. Bendick Rebuttal Decl. ¶ 47. But he still fails to address the fact that he was unable to identify the source of the addresses he used for the probability assignments that were the basis of his estimates of actual representation. Amidon Decl. ¶ 35. As noted in Dr. Amidon's Declaration, "it is the policy of the American Economic Association to publish papers only if the data used in the analysis are clearly and precisely documented and are readily available to any researcher for purposes of replication." *Id.* ¶ 35, n.37.

Dr. Bendick offers a feckless defense for what was plainly an error on his part in using the wrong formula in Excel. *Compare* Amidon Decl. ¶¶ 39-41 (noting Dr. Bendick's testimony that he did not intend to include zeros in his calculation) *with* Bendick Rebuttal Decl. ¶¶ 21-24 (asserting "it is unclear whether including or excluding zeros" increases or decreases reliability). And contrary to the suggestion in Attachment A to Dr. Bendick's Rebuttal Declaration, Dr. Amidon *did not* estimate actual representation for any of the years at issue simply by identifying his mistake. Indeed, Dr. Amidon stressed that "[d]ue to the underlying unreliability of Dr. Bendick's methodology, the percentages reflected in [Table 5] should not be viewed as an accurate representation of the racial composition of workers referred by MVP to GSB." Amidon Decl. ¶ 41, n.41. So it is grossly misleading for Dr. Bendick to refer to "Dr. Amidon's" calculations of actual representation. *See e.g.* Bendick Rebuttal Decl., ¶ 22, Attachment A, section 3, Table R-1.

## III.    THE COURT SHOULD STRIKE DR. BENDICK'S REBUTTAL DECLARATION.

### A.    The court should strike Dr. Bendick's rebuttal declaration because it is inadmissible hearsay.

Dr. Bendick's Rebuttal Declaration is an unsworn hearsay statement, except for those admissions referred to in Section II.A. above, which constitute admissions of a party opponent pursuant to Federal Rule of Evidence 801(d)(2).

An unsworn affidavit is admissible in federal court only if executed in accordance with 28 U.S.C. § 1746. If executed outside of the United States, Section 1946 requires that an unsworn affidavit include the statement, or a statement substantially similar to, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." 28 U.S.C. § 1746. Dr. Bendick executed his Rebuttal Declaration in York, England. Bendick Rebuttal Decl., pg. 27. He failed to include the phrase "under the laws of the United States of America" or any substantially similar statement. *Id.* As a result, Dr. Bendick's declaration should be stricken in its entirety for failure to comply with Section 1946. *See Int'l Ins. Co. v. Caja Nacional De Ahorro Y Seguro,* 293 F.3d 392, 398-99 (7th Cir. 2002) ("an affidavit executed outside the United States must include a statement that the affiant has made his declarations 'under penalty of perjury under the laws of the United States of America.'") (citing 28 U.S.C. § 1746).[21]

---

[21] *See also Digisound-WIE, Inc. v. BeStar Techs., Inc.*, No. 07 C 6535, 2008 U.S. Dist. LEXIS 39860, at *4-5 (N.D. Ill. May 16, 2008) (Lindberg, J.) ("Mr. Zeich's affidavit does not include the phrase 'under the laws of the United States of America,' or any substantially similar statement. Therefore, the court will not consider Mr. Zeich's affidavit."); *Eli Lilly & Co. v. Arch Ins. Co.*, No. 1:13-cv-01770-LJM-TAB, 2017 U.S. Dist. LEXIS 105833, at *17-19 (S.D. Ind. July 10, 2017) ("Because the Affidavits do not substantially state that they were made pursuant to the penalties of perjury 'under the laws of the United States of America,' the Affidavits do not comply with the requirements of 28 U.S.C. § 1746. The absence of this language is critical because without it, the JLT Witnesses have not subjected themselves to the perjury laws of the United States, and there is no way for the Court to enforce such perjury laws to ensure the veracity of the Affidavits."); *Ostrow v. Globecast Am. Inc.*, No. 10-61348-CIV - ROSENBAUM, 2011 U.S. Dist. LEXIS 117889, at *11-12 n.4 (S.D. Fla. Oct. 13, 2011) ("the Pinon and Mazurie declarations omit the one necessary item for declarations sworn outside the United States that does not exist for those sworn within the United States: an acknowledgment that the declarant is subject to the laws of perjury of the

19

**B.      Dr. Bendick's newly disclosed opinions should be stricken as untimely.**

In several paragraphs of Dr. Bendick's Rebuttal Declaration, Plaintiffs offer alternative analyses and opinions regarding alleged shortfalls in non-Hispanic African American assignments to GSB to support their motion for class certification, based on data previously available to them (the "Newly Disclosed Opinions"), all in the event that the Court decides that Dr. Bendick's earlier opinions should be stricken under *Daubert*.[22] (Oddly, however, he explicitly states that these new opinions are *less reliable* than his earlier opinions, Bendick Rebuttal Decl. ¶2(a), 2(c), 17, 24, 28, 30, so they too should be stricken for the reasons previously set forth.) In any event, these Newly Disclosed Opinions should also be stricken because Plaintiffs' expert disclosure deadline passed on March 28, 2018. ECF Nos. 538; 539; 542.

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs expert discovery and "requires a party to disclose a retained expert's written report that includes 'a complete statement of all opinions the witness will express and the basis and reasons for them.'" *Berkheimer v. Hewlett-Packard Co.*, No. 12 C 9023, 2016 U.S. Dist. LEXIS 68750, at *4-5 (N.D. Ill. May 25, 2016) (Gilbert. M.J.) (quoting Fed. R. Civ. P. 26 (a)(2)(B)(i)). The Court directed Plaintiffs to disclose their expert reports by March 28, 2018. ECF Nos. 539; 542. Plaintiffs submitted Dr. Bendick's original declaration on that date. Then on June 1, 2018, after MVP identified errors in his original report, Plaintiffs submitted to Defendants via email—but did not file with this Court—a "Revised" report from Dr. Bendick along with "CORRECTED" data. Richardson Decl. ¶ 5, Ex. C. On August 21, 2018, in connection with their opposition to Defendants' Motion to

---

United States. Consequently, the Pinon and Mazurie declarations do not substantially comply with Section 1746(1) and should be stricken.") *aff'd*, 489 F. App'x 433 (11th Cir. 2012).

[22] The paragraphs containing this improper testimony are ¶¶ 2(b), 2(d), 2(g), 17-20, 28-32, and 39-42 .

Strike, Plaintiffs submitted yet another report from Dr. Bendick which they labeled a "Rebuttal" declaration. ECF 638-6.

Expert rebuttal reports are limited to testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Rule 26(a)(2)(D)(ii). A party is not permitted to "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief," which is precisely what Plaintiffs are attempting here. *Stanfield v. Dart*, No. 10 C 6569, 2013 WL 589222, at *3 (N.D.Ill. Feb.14, 2013) (citing *Peals v. Terre Haute Police Dep't.*, 535 F.3d 621, 630 (7th Cir.2008)); *see also Lowe v. CVS Pharmacy, Inc.,* No. 14 C 3687, 2017 WL 2152385, at *2 (N.D. Ill. May 17, 2017) ("A rebuttal expert report 'cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions.'") (quoting *Larson v. Wis. Cent. Ltd.,* No. 10-C-446, 2012 WL 368379, at *4 (E.D. Wis. Feb. 3, 2012)).

The duty to supplement under Rule 26(e) applies only where new information "has not otherwise been made known to the other parties during the discovery process or in writing." *Berkheimer*, 2016 U.S. Dist. LEXIS 68750, at *5 (denying plaintiff's motion for leave to amend or supplement expert report on damages). It does not apply where the opposing expert "pointed out an ostensible flaw" in the expert's analysis. *Id.* at *14. And it "does not allow a party to tender wholly new expert opinions." *Butler v. Sears Roebuck & Co.*, No. 06 C 7023, 2010 WL 2697601, at *1 (N.D. Ill. July 7, 2010) (*citing Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924, 933 n. 1 (N.D.Ill.2008)). A party may not supplement their expert's report after the disclosure deadline with material to which they already had access when they submitted their expert's original report. *See Berkheimer*, 2016 U.S. Dist. LEXIS 68750, at *10 ("[Plaintiff] provides no reason that the information he wants [the expert] to include in her 'supplemental' report could not have been included in her original report if she thought it was important or necessary to do so

21

then."); *Welch v. Eli Lilly & Co.*, No. 1:06-cv-0641-RLY-JMS, 2009 U.S. Dist. LEXIS 21417, at
*13-14 (S.D. Ind. Mar. 16, 2009) (Magnus-Stinson, M.J.) ("The original expert deadline was the
time for Plaintiffs to have provided a complete statistical analysis based on the data they had.
The Court cannot countenance the circuitous process invoked by Plaintiffs with their
supplement."); *Borom v. Town of Merrillville*, No. 2:07 cv 98, 2010 U.S. Dist. LEXIS 108034, at
*5 (N.D. Ind. Oct. 8, 2010) ("[W]hen the party seeking to supplement . . . has been in possession
of the material since the report originally was prepared, leave to amend the report generally will
not be granted."). Substantial portions of Dr. Bendick's Rebuttal Declaration are neither proper
rebuttal testimony nor appropriate supplementation. The court should disregard them.

Plaintiffs had access to all of the data referenced in Dr. Bendick's Rebuttal Declaration
well before Dr. Bendick provided his initial declaration at the end of March 2018. MVP
produced in 2014 the addresses he purports to analyze in Paragraphs 2(b), 5(a), and 17-20
regarding expected availability. These addresses also form the basis of Dr. Bendick's new
shortfall analysis in Paragraphs 2(d) and 28-32. And Dr. Bendick also had access since 2014 to
the PUMA data for which he now purports to analyze margin of error—after testifying that it
was "essentially not possible" to do so[23]—in Paragraphs 2(g) and 39-42. Because these data were
all available to Plaintiffs years before the deadline for expert disclosures, the portions of Dr.
Bendick's Rebuttal Declaration that purport to analyze them and offer new opinions are
improper and should be stricken. *See Lowe*, 2017 WL 2152385, at *2 (striking portions of
rebuttal declaration that reported the results of gap analysis where opposing expert merely
opined that a gap analysis was unworkable and offered no affirmative gap analysis); *Berkheimer*,
2016 U.S. Dist. LEXIS 68750, at *14 ("Rule 26(e) is not a back door that can be used to
'supplement' expert reports *ad infinitum* until all experts have had their say in a running dialogue

---

[23] Bendick Dep. 143:8-145:3.

with their opposing experts, including about matters that should or would have been included in the experts' initial reports or disclosures if they thought about them.").

The *Lowe* decision is instructive regarding the contours of proper rebuttal testimony. The plaintiffs there alleged that the defendants violated the Telephone Consumer Protection Act by using an automated dialing system or artificial voice to call plaintiffs' cell phones without consent. *Lowe*, 2017 WL 2152385 at *1. The defendants' expert opined that it was not possible to perform a so-called "gap analysis" comparing data regarding the individuals who were called and the individuals who consented due to the "large number of call records" to be analyzed. *Id.* Plaintiffs offered a rebuttal expert report, which, *inter alia*, conveyed the results of a gap analysis performed on the data. The defendants moved to strike this portion of the report as improper rebuttal testimony. The court granted the motion in part, stressing that plaintiff's expert *could* "opine that it is *possible* to perform a gap analysis on the data" because that rebutted defendant's expert's testimony to the contrary. *Id.* at *2. However, the court held that plaintiff's expert *could not* "opine about the results of his gap analysis, *i.e.*, the number of calls for which there is no proof of consent, because [defendants' expert] did not provide an opinion on that issue." *Id.* Similarly, the court held that the plaintiff's expert could explain *why* he disagreed with defendant's expert about whether certain information could be relied on to determine whether an individual provided consent, but he could "not testify about the *results* he obtained using his alternate method." *Id.*

Here, Dr. Amidon opined that Dr. Bendick's original analysis relied upon a data set compiled by plaintiff's counsel which excluded addresses without regard to a determination of their relevance. Amidon Decl. ¶¶ 14-19. She testified that Dr. Bendick should have investigated the nature of the data, reviewed the source files from which plaintiff's counsel compiled the data, and realized that more information was necessary to determine which addresses were appropriate

23

to include in his analysis. Amidon Decl. ¶¶ 45-47. Dr. Amidon did not, however, offer any opinions regarding expected representation or actual representation of non-Hispanic African Americans. Indeed, she testified in no uncertain terms that she did not know what effect incorporating the additional addresses, for example, would have on the expected representation because she would need more information to identify the correct addresses for an analysis. Amidon Dep. 145:19-147:4; Amidon Decl. ¶¶ 14-19.

Yet Dr. Bendick's Rebuttal Declaration offers new opinions that reflect additional analyses that he performed after his deposition and after receipt of Defendants' Motion to Strike on data *previously available* to Plaintiffs. Bendick Rebuttal Decl. ¶¶ 2(b); 5(a); 17-20. That is precisely the approach rejected in *Lowe*.

Dr. Bendick cannot refute Dr. Amidon's actual criticism—that he failed to identify the universe of relevant addresses for use in his expected representation analysis. Indeed, as noted above in Section II.A. he concedes that an expert operating in his profession must understand the origin and relevance of the data he works with. So he mischaracterizes Dr. Amidon's opinions, suggesting that she has identified a relevant universe of additional addresses—something she explicitly testified she had not done. Then he relies on those additional addresses to form new opinions regarding expected representation of non-Hispanic African Americans. And he veils as "rebuttal" this new opinion that "there is a substantial, persistent, class-wide shortfall *under all the arguable alternative calculations of expected representation and actual representation.*" Bendick Rebuttal Decl. ¶ 27 (emphasis in original).

He also wrongly suggests that Table 5 of Dr. Amidon's Declaration reflected the actual representation of Black non-Hispanic laborers among GSB referrals for the years 2009 to 2014, and specifically that the figure was 3.9% in 2009 and that the figure was 8.1% on average for the years 2009 to 2013. Bendick Rebuttal Decl. ¶¶ 2(c)-(d), 22, 24-25, 28-32. To the contrary, Dr.

Amidon made explicit in her declaration that "[d]ue to the underlying unreliability of Dr. Bendick's methodology, the percentages reflected in [Table 5] *should not be viewed as an accurate representation* of the racial composition of workers referred by MVP to GSB." Amidon Decl., at 21, n.41 (emphasis added). Dr. Amidon provided Table 5 to show the effect of correcting *just one* of Dr. Bendick's errors in his actual representation analysis—namely, using a formula in Excel that was indicated by Dr. Bendick's own deposition testimony. Amidon Decl. ¶ 38-41. Dr. Bendick misrepresents Dr. Amidon's critique so he can disguise as rebuttal his *new* analysis that the figures identified in her Table 5 reveal—*assuming his data set is relevant and his methodology is sound*—statistically significant shortfall in certain years. This analysis is not proper rebuttal or supplementation. It is a new opinion, based on information previously available to Plaintiffs that was not timely disclosed in advance of the cut-off for their expert disclosures. Accordingly, it is improper and should be disregarded.

## IV.    CONCLUSION

For the reasons described above, Dr. Bendick's reports should be stricken in their entirety as inadmissible.

Dated:  September 5, 2018

By:   /s/ Blake T. Hannafan
     Blake T. Hannafan
     HANNAFAN & HANNAFAN, LTD.
     One East Wacker Drive, Suite 2800
     Chicago, Illinois 60601
     (312) 527-0055  phone

     James J. Convery
     Clifford R. Perry, III
     Peter J. Gillespie
     LANER MUCHIN, LTD.
     515 North State Street, Suite 2800
     Chicago, Illinois 60654
     (312) 467-9800  phone
     (312) 467-9479  fax

*Attorneys for Defendant Gold Standard Baking, Inc.*

Respectfully submitted,

By:   /s/ Kennth W. Gage
     Kenneth W. Gage
     PAUL HASTINGS LLP
     200 Park Avenue
     New York, NY  10166
     kennethgage@paulhastings.com
     (212) 318-6046

     Alex J. Maturi
     PAUL HASTINGS LLP
     71 S. Wacker Drive
     Chicago, IL  60606
     alexmaturi@paulhastings.com
     (312) 499-6076

     Elliot Richardson
     Michele D. Dougherty
     KOREY RICHARDSON LLC
     20 S. Clark Street, Suite 500
     Chicago, IL  60603
     (312) 372-7075

*Attorneys for Defendant Personnel Staffing Group, LLC d/b/a Most Valuable Personnel*

## CERTIFICATE OF SERVICE

I, Alex J. Maturi, certify that on September 5, 2018, pursuant to Fed. R. Civ. P. 5

and the Northern District of Illinois's General Order on Electronic Case Filing, sec. XI, I caused

the attached **Defendants' Reply in Support of Motion to Strike the Declaration of Marc**

**Bendick, Ph.D.** to be filed electronically with the Clerk of Court through ECF, and that ECF will

send an e-notice of the electronic filing to all counsel of record.

/s/ Alex J. Maturi
Alex J. Maturi
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, IL 60606
alexmaturi@paulhastings.com
(312) 499-6076